Sharon M. SMART, Plaintiff, Appellant,

v.

**The GILLETTE COMPANY LONG–TERM DISABILITY PLAN, Defendant, Appellee.**

No. 95–1705.

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1995.

Decided Nov. 22, 1995.

Richard L. Burpee, with whom Burpee & DeMoura was on brief, Boston, MS, for appellant.

John H. Mason, with whom Richard P. Ward, David T. Lyons, and Ropes & Gray, were on brief, Boston, MS, for appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

Plaintiff-appellant Sharon Smart sued The Gillette Company Long–Term Disability Plan (Plan or LTD Plan) for benefits she asserts were wrongfully denied her. The district court ruled that Smart had waived her claim. *See Smart v. The Gillette Co. Long–Term Disability Plan*, 887 F.Supp. 383 (D.Mass. 1995). We affirm.

## I. BACKGROUND

We take the underlying facts principally from the parties' pretrial stipulations. The Gillette Company (Gillette) hired appellant in 1976. In time, she became a senior product analyst. Her job involved travel in connection with the testing of Gillette products. In 1986, appellant injured her left knee in a work-connected automobile accident. Between 1986 and 1990, she underwent four surgical procedures in hopes of repairing the damage to her knee. She worked sporadically during the first half of this period, but not at all after September 8, 1988.

On September 7, 1988, Gillette, bent on terminating appellant's at-will employment at year's end as part of a reduction in force, sent her a letter that outlined a proposed severance arrangement. Under it, appellant for a time would receive severance pay and assorted benefits to which she would not otherwise be entitled, but would go quietly into unemployment's dark night, releasing any and all federal and state claims she might have against Gillette. The September 7 letter listed the LTD Plan among the extended benefits that appellant would enjoy if she accepted the proposal.

Apparently concerned about her injured knee, appellant did not immediately embrace the suggested severance terms, but, rather, began a negotiation aimed at excluding workers' compensation claims from the sweep of the requested release. Gillette eventually acquiesced and, on December 16, 1988, sent appellant a new letter that differed from the September 7 letter in two important respects. First, it expressly excluded workers' compensation claims from the general release. Second, it did not mention the LTD Plan (an omission that had the effect of dropping the Plan from the list of benefits that would continue during the severance period).

Appellant reviewed the December 16 letter with her lawyer and signed it on December 29. Gillette terminated her employment effective December 31. As per the agreement, appellant collected severance pay until November 4, 1989, and received the other benefits listed in the December 16 letter throughout the severance period (i.e., January 1 through November 4, 1989). During that same time frame, she settled her workers' compensation claim for $43,750 and began collecting $887 per month in social security disability payments.

On October 2, 1991, appellant filed an application for benefits under the Plan, alleging that she had become "permanently and totally disabled" during the severance period. Gillette's corporate counsel denied the application out of hand. After a series of fruitless requests for reconsideration, appellant sued.

The district court did not reach any of the variegated issues associated with whether appellant did (or did not) display a total and permanent disability as defined by the LTD Plan while still a participant in it. The court instead found in effect, after an evidentiary hearing replete with stipulated facts, that appellant's Plan participation ended when her employment ended (December 31, 1988), and that, therefore, she had no cognizable claim in respect to a disability that did not materialize until sometime in 1989 at the earliest.

## II. DISCUSSION

After careful examination of the record, the briefs, and the applicable law, we hold

that the severance agreement made no provision for extended participation in the LTD Plan. Consequently, Smart's appeal fails. For ease in explanation, we divide our analysis into moieties.

### A. *The Severance Agreement.*

Appellant argues that the terms of the severance agreement did not include a surrender of Plan benefits, but that, to the exact contrary, the parties intended to permit appellant to enjoy such benefits as part of the consideration tendered by Gillette for the release. We approach this contention mindful that the December 16 letter agreement, signed by both parties, represents a contract between Smart and Gillette that potentially affects rights protected by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (1988), and, thus, is likely subject to interpretation in accordance with tenets of federal common law.[1] *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987).

In construing the terms of contracts that are governed by federal common law, we are guided by "common-sense canons of contract interpretation." *Burnham v. Guardian Life Ins. Co.,* 873 F.2d 486, 489 (1st Cir.1989). One such canon teaches that contracts containing unambiguous language must be construed according to their plain and natural meaning. *See id.* "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989). Interpreting unambiguous terms is an activity that requires judges to expound the law rather than to find the facts, and, therefore, a trial court's interpretive determinations are subject to plenary review. *See, e.g., Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992). In most cases, the question of

whether a contract term is ambiguous also presents a question of law subject to plenary review. *See id.; see also RCI Northeast Servs. Div. v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987).

If an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents. When this need arises, these facts, together with the reasonable inferences extractable therefrom, are together superimposed on the ambiguous words to reveal the parties' discerned intent. This construct ordinarily requires the judge in a non-jury case to resolve questions of fact rather than questions of law. *See In re Newport Plaza Assocs.,* 985 F.2d 640, 645 (1st Cir.1993) (stating that "the interpretation of [ambiguous] contract language, itself acknowledged, becomes a question of fact for the jury rather than a question of law for the judge"); *RCI Northeast,* 822 F.2d at 202 (explaining that when "the plain meaning of a contract phrase does not spring unambiguously from the page or from the context, its proper direction becomes one for the factfinder, who must ferret out the intent of the parties"). In such circumstances, a reviewing court will uphold the factfinder's resolution of the question unless it is clearly erroneous. *See* Fed.R.Civ.P. 52(a); *see also In re Navigation Technology Corp.,* 880 F.2d 1491, 1495 (1st Cir.1989).

In this case, appellant's assault focuses on the following language in the severance agreement:

> In consideration of the severance pay *and other benefits to be provided* you as part of The Gillette Company's Restructuring Program, you do hereby ... release and agree to indemnify and hold harmless [Gillette] ... from any and all claims, charges, complaints, or causes of action, now existing, both known and unknown or arising in the future, including but not limited to, all

---

1. We need not probe this point too deeply. Because the result here is unaffected by choice of law, we can simply assume (as have the litigants and the lower court) that federal statutory and common law supply the rules of decision. *See Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1092 (1st Cir.1989).

claims of breach of contract ..., or [claims] arising from alleged violations of ... any ... local, state, or federal law, regulation or policy or any other claim relating to or arising out of your employment with [Gillette] or termination thereof.... (Emphasis supplied.)

According to appellant, the underscored phrase is ambiguous because the agreement makes no reference to the LTD Plan, leaving up in the air whether Smart will retain coverage during the severance period as a part of the consideration ("severance pay and other benefits") for the general release. Thus, appellant's thesis runs, the trial court should have mulled extrinsic evidence—including the September 7 letter—to resolve the uncertainty, and, had it done so, would perforce have concluded that the phrase "other benefits" in the December 16 letter encompassed extended coverage under the LTD Plan.

Appellant's mental gymnastics are nimble, but they score low marks for substance. Accepted canons of construction forbid the balkanization of contracts for interpretive purposes. *See Fashion House*, 892 F.2d at 1084 (examining agreement as a whole to interpret one part); *see also Restatement (Second) of Contracts* § 202 cmt. d (1981) (explaining that "[w]here the whole can be read to give significance to each part, that reading is preferred"). Here, when the phrase "other benefits" is read in the full context of the document, the language is not ambiguous at all. The preceding paragraphs of the letter agreement spell out precisely which benefits, in addition to severance pay, appellant will receive in exchange for the release. They include, with various qualifications, extended participation in employee health and dental plans, life insurance, a savings plan, and an employee stock ownership plan. Viewed against this backdrop, it is pellucid that the later use of the "other benefits" terminology refers to the benefits enumerated *in the text of the document itself.*

We think that this case is a classic example of a situation in which the hoary maxim *expressio unius est exclusio alterius* is helpful. The maxim instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded. *See, e.g., FDIC v. Singh*, 977 F.2d 18, 22–23 (1st Cir.1992) (applying *expressio unius* rule). While this interpretive maxim is not always dispositive, it carries weight; and when, as now, there is absolutely nothing in the agreement's text that hints at some additional item lurking beyond the enumerated list, we see no reason why the maxim should not be controlling. We conclude from what is written within the four corners of the severance agreement, therefore, that the phrase "other benefits" simply and unambiguously describes the benefits enumerated in the agreement itself (and, hence, does not include continued coverage under the Plan).

Appellant has a fallback position. She doggedly insists that, regardless of the language of the December 16 letter, evidence from the parties' negotiations and "course of performance" reveals that they actually intended to include extended coverage under the Plan as part of the consideration for the release. This insistence is misplaced.

As a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous. *See Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 586 (1st Cir.1993); *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 32 (1st Cir.1991). However, if the evidence is not offered to infuse the contract with meaning, but only to demonstrate that a term is vague or ambiguous in the first place, then the situation may be different; courts sometimes may ponder extrinsic evidence to determine whether an apparently clear term is actually uncertain.[2] *See Restatement (Second), supra,* § 212 cmt. b (suggesting that determinations of ambiguity are best "made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties"); E. Allan Farnsworth, *Farnsworth on Contracts* § 7.12, at 277–78 (1990) (approving this

---

**2.** In our view, this possibility should not alter or affect the rule that the determination of ambiguity is, in the first instance, a question of law for the judge.

view); *see also* Arthur L. Corbin, *Contracts* § 579 (1960) (to like effect). But this exception is narrow at best, and is inapposite here. In the most permissive of jurisdictions, extrinsic evidence will be considered for the purpose of determining whether an ambiguity exists only if it suggests a meaning to which the challenged language is reasonably susceptible. *See* Farnsworth, *supra*, § 7.12, at 278. In no event may extrinsic evidence be employed to contradict explicit contract language or to drain an agreement's text of all content save ink and paper. *See Burnham*, 873 F.2d at 489 (admonishing that "courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended or imagined").

In this case, the extrinsic evidence to which appellant points reveals nothing remotely resembling an amphiboly in the contextual meaning of "other benefits." That evidence falls into two categories. The first category juxtaposes the September 7 and December 16 letters, and asks us to remark the fact that extended Plan participation was included as part of the first offer, and then deleted without special mention from the offer which appellant actually accepted. But even if remarked this fact confirms, rather than refutes, that LTD Plan benefits were intended to be outside the "other benefits" explicitly promised in the December 16 agreement. Put another way, Gillette's deletion of the Plan from the list of preserved benefits bolsters the applicability of the *expressio unius* maxim.

The second category of extrinsic evidence to which appellant adverts is cobbled together from a series of letters written by Gillette's counsel in the process of denying appellant's claim for LTD Plan benefits on its merits. Appellant maintains that these missives prove that, in the course of performing the terms of the severance agreement, the Plan administrator interpreted the agreement as commemorating appellant's potential eligibility for benefits. Although courts sometimes rely on such "course of performance" evidence to interpret ambiguous contract terms, *see, e.g., Agathos v. Starlite Motel*, 977 F.2d 1500, 1509 (3d Cir.1992);

*Schultz v. Metropolitan Life Ins. Co.*, 872 F.2d 676, 679 (5th Cir.1989), we do not find appellant's evidence useful here.

For one thing, the correspondence in question postdates the accrual of the dispute between the parties—indeed, it came into being only after the severance agreement itself had expired—whereas course-of-performance evidence typically involves "the conduct of the parties *before* the advent of a controversy." *Schultz*, 872 F.2d at 679 (emphasis supplied). For another thing, the targeted correspondence, which seems to assume appellant's eligibility under the Plan in September of 1989, involves only a single claim for benefits. These communiques, whether read singly or in the ensemble, do not affirmatively acknowledge either an extension of coverage or appellant's generic entitlement to benefits. On the whole, therefore, the correspondence falls short of evincing the repeated dealings that might constitute a course of performance between the parties sufficient to indicate that "other benefits" means something different than what the contract itself discloses. *See generally Restatement (Second)*, *supra*, § 202(4) (explaining that "course of performance" is relevant "[w]here an agreement involves repeated occasions for performance"); *id.* cmt. g (noting that course of performance "is not conclusive of meaning," and that such conduct "must be weighed in the light of the terms of the agreement and their possible meanings").

To sum up, whether or not we refer to extrinsic evidence, the severance agreement is free from ambiguity. That agreement effectively extinguishes appellant's claim in that, contrary to appellant's advertisement, it does not include a promise to extend Plan coverage. The remaining issue, then, concerns the validity of the severance agreement.

### B. *The Putative Waiver.*

Appellant labors to convince us that the agreement she signed was invalid because it amounted to a waiver, and the waiver, in turn, was unenforceable under ERISA. We think that this formulation misconstrues the issue. As we see it, no waiver is in play here. Appellant signed a severance agree-

ment under which Gillette promised her some extended benefits (but not LTD Plan benefits). That agreement could not have waived her right to participate in the Plan during the severance period because she had no such right *unless the employer affirmatively agreed to enlarge her eligibility under the Plan.* As we have ascertained, *see supra* Part II(A), Gillette did no such thing.

To be sure, the waiver argument can be recast in terms of appellant's release of all claims she might have against Gillette—a release that purportedly surrenders claims under ERISA for the wrongful denial of benefits. This is at best a bootstrap approach to creating a justiciable waiver issue, for one can scarcely release claims that one does not possess. And, moreover, we are at loss to see how an employer can "wrongfully" deny benefits to which an employee (or, more precisely put, an ex-employee) is not entitled in the first place. *See* Ronald J. Cooke, *ERISA Practice and Procedure* § 2.08, at 2–28 (1995) (emphasizing that "ERISA affords no rights or protections to those who are not participants" in a benefit plan).

▮▮▮ At any rate, even if we assume that we are dealing with an actual rather than an ersatz waiver, the waiver is permissible. Congress passed ERISA in part to protect the rights of employees who choose to participate in welfare benefit plans. *See* 29 U.S.C. § 1001; *see also Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 955–56, 103 L.Ed.2d 80 (1989). To achieve that end, the statute establishes a private right of action for employees who allege that a plan administrator wrongfully denied a claim for benefits due under the provisions of the plan. *See* 29 U.S.C. § 1132(a). But Congress did not go so far as to prohibit an employee from waiving her

right to participate in an employee welfare benefit plan. *See Rodriguez–Abreu,* 986 F.2d at 587; *Finz v. Schlesinger,* 957 F.2d 78, 81 (2d Cir.), *cert. denied,* 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992); *Laniok v. Advisory Comm. of the Brainerd Mfg. Co. Pension Plan,* 935 F.2d 1360, 1364–66 (2d Cir.1991); *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 455 (7th Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Leavitt v. Northwestern Bell Tel. Co.,* 921 F.2d 160, 161–62 (8th Cir. 1990).

▮▮▮ Of course, despite the fact that employee waivers are not forbidden, ERISA evinces Congress's intent to preserve employee pension and benefit rights. *See, e.g., Laniok,* 935 F.2d at 1367. In ERISA cases, therefore, courts should scrutinize an ostensible waiver with care in order to ensure that it reflects the purposeful relinquishment of an employee's rights. *See Finz,* 957 F.2d at 81; *In re HECI Exploration Co.,* 862 F.2d 513, 523 (5th Cir.1988). At a minimum, such waivers, to be effective, must be "knowing and voluntary." *Rodriguez–Abreu,* 986 F.2d at 587.

▮▮▮ In *Finz,* building on *Laniok,* the Second Circuit crafted a compendium of six factors that are often relevant to this inquiry.[3] We find this list helpful rather than conclusive. Generally, no single fact or circumstance is entitled to talismanic significance on the question of waiver. Only an inquiry into the totality of the circumstances can determine whether there has been a knowing and voluntary relinquishment of an ERISA-protected benefit. *See, e.g., Leavitt,* 921 F.2d at 162. For that reason, every case is *sui generis.*[4]

---

**3.** These six factors include: (1) the plaintiff's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the plaintiff to study the agreement before acting on it; (5) whether the plaintiff had independent advice—such as the advice of counsel—when she signed the agreement; and (6) the nature of the consideration tendered in exchange for the waiver. *See Finz,* 957 F.2d at 82; *Laniok,* 935 F.2d at 1368.

**4.** In *Rodriguez–Abreu,* for example, the plaintiff was a manager who knew that he could not accept the severance package while at the same time retaining long-term disability benefits, and who had consulted with an accountant before making his decision. We upheld a finding that he had validly waived continued participation in a long-term disability plan as part of his acceptance of a voluntary severance package. *See Rodriguez–Abreu,* 986 F.2d at 588.

 The inquiry into waiver consists of two questions: whether a party actually knew she was relinquishing a benefit, and whether she acted voluntarily in doing so. Answering these companion questions is a fact-intensive exercise, and the trier's fact-finding is entitled to deference (unless it is tainted by a mistake of law). *See Irons v. FBI*, 811 F.2d 681, 684 (1st Cir.1987) ("Where the conclusions of the trial court depend on its election among conflicting facts or its choice of which competing inferences to draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error.").

 Measured against this standard, the lower court's findings are irreproachable. The court correctly synthesized the law. It then surveyed, *inter alia*, the six *Finz* factors. *See Smart*, 887 F.Supp. at 386. It found appellant to be well-educated and commercially sophisticated (she had a college degree, some postgraduate business courses, and over ten years of professional experience at Gillette), and to have negotiated the specific terms of the severance agreement. Those terms provided her with benefits that Gillette was not otherwise obligated to furnish. The final version of the agreement was very clear, and appellant reviewed it with an attorney of her choosing before signing it. Without exception, these findings—which cover five of the six *Finz* factors—are supportable.

The court's remaining finding—that appellant had adequate time to review the severance agreement before she executed it—is not quite so clear-cut. Nevertheless, it implicates only one of several factors that are involved in the decisional calculus, and, in any event, we do not think that the court committed clear error in determining that the time available to Smart was sufficient to permit a complete, thoughtful perscrutation of the operative version of the agreement. We explain briefly.

The lower court rested the controverted finding on the notion that appellant had over three months to review the agreement before signing it. *See id.* This temporal computation assumes that the relevant interval began with appellant's receipt of the September 7 letter. Appellant attacks the court's underlying premise on the ground that the relevant interval began with her receipt of the December 16 agreement, leaving her less than two weeks in which to review the proposal.

This is a case of the glass being half-empty or half-full, depending on how the observer opts to characterize it. Appellant did have more than three months within which to consider the prospect of early, forced retirement and to mull those provisions peculiarly important to her condition (like workers' compensation and LTD Plan benefits). One could reasonably expect her to have been especially attentive to such provisions in reading the revised version of the document. What is more, a twelve-day period seems ample to permit a sophisticated business-woman and her lawyer carefully to review the terms of a fairly straightforward severance agreement even if the review had to proceed from scratch.

In fine, taking into account the total complex of events, the district court's fact-based finding that appellant knowingly and voluntarily waived her claim to benefits under the Plan is supportable.[5]

## III. CONCLUSION

We need go no further. Appellant negotiated and signed a contract that unambiguously excluded her from extended participation in Gillette's LTD Plan. In so doing she simultaneously relinquished any ERISA-protected claims. The trial court found that

---

**5.** Although appellant admitted that she understood when she signed the severance agreement that she was waiving all claims under both federal and state law, she also testified that she "did not know what ERISA was when she signed the release; that she did not know that she was releasing any rights under ERISA; and that she did not intend to release any rights under ERISA." This testimony does not diminish our respect for the district court's finding of waiver. An employee does not need to know about her rights *under ERISA* to know that she is waiving her rights *under a benefit plan* that ERISA happens to protect. Once appellant intentionally let slip her opportunity to participate in the benefit plan, she no longer possessed a substantive "right" protected by ERISA.

her actions were both knowing and voluntary. Discerning no error, we will not disturb the judgment.

*Affirmed.*