167 F.3d 709
 Pens. Plan Guide (CCH) P 23,951R
Fabio T. MORAIS, Plaintiff, Appellant,
v.
CENTRAL BEVERAGE CORPORATION UNION EMPLOYEES' SUPPLEMENTAL
RETIREMENT PLAN, Abacus Benefit Consultants and
George Matta, Sr., Defendants, Appellees.
 No. 98-1725.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 5, 1999.
Decided Feb. 11, 1999.
 
 Marybeth Holland for appellant.
 Richard D. Wayne with whom Debra Dyleski-Najjar and Samuel J. Kolodney were on brief for appellees Central Beverage Corporation Union Employees' Supplemental Retirement Plan and George Matta, Sr.
 Joseph J. Reale, Jr. for appellee Abacus Benefit Consultants.
 Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.
 COFFIN, Senior Circuit Judge.
 
 
 1
 Appellant Fabio Morais claims that his disability pension was incorrectly calculated by his employer's retirement plan. He first raised this issue in 1994, and resolved the dispute at that time by signing a "Settlement Agreement" under which he was given $5,000. About two years later, Morais raised the same complaint about his benefits and, unsatisfied by the response, brought this case under ERISA, see 29 U.S.C. § 1132(a)(1)(B), against the plan and its administrator.[1] The district court granted summary judgment for the defendants, adopting the magistrate judge's Report and Recommendation that the Settlement Agreement barred Morais' claims. We affirm.
 
 I. Background
 
 2
 The following facts are undisputed. Morais worked for Central Beverage Corporation for many years before retiring in 1993 following serious on-the-job back injuries. He was awarded a total disability pension but, at some point thereafter, was advised that his monthly payments would be reduced to offset a lump sum payment he received in settlement of a workers compensation claim.[2] Morais objected to the reduction in benefits and filed a union grievance. On December 30, 1995, Morais and George Matta, president of Central Beverage, signed a document labeled "Settlement Agreement," in which Morais acknowledged receiving $5,000 for releasing "and forever discharg[ing]
 
 
 3
 Central, its agents, officers, directors and employees, and the Central Beverage Corp. Union Employees' Supplemental Retirement Plan and its Administrator, from all claims or causes of action whatever which he may now have or hereafter can, shall or may have by reason of any matter, cause or action or thing whatever, including, but not limited to, any claims arising out of his retirement from the employ of Central and the calculation of his disability pension, and/or any other federal, state or local laws, regulations or ordinances, which he had, now has or shall have as of the date of this Agreement.
 
 
 4
 The Agreement also stated that Morais had directed Teamsters' Local Union No. 251 to withdraw his grievance and his demand for arbitration.
 
 
 5
 In mid-1997, some twenty months after the Agreement was signed, Morais again sought a recalculation on the same basis. His claim was denied and, in January 1998, he filed this lawsuit. In addition to a claim under ERISA challenging the offset of his worker's compensation benefits against his monthly disability pension, Morais alleged a breach of fiduciary duty by Matta and a state law claim against all defendants for intentional infliction of emotional distress.
 
 
 6
 The defendants moved to dismiss based on the Agreement. Morais opposed the motion, claiming that the Agreement was invalid because of a variety of factors assertedly showing that he was at an unfair disadvantage in the dealings leading to the Agreement and that he failed to appreciate the impact of signing it. See infra at 711. The magistrate judge converted the motion to one for summary judgment and, after a hearing, applied Rhode Island contract law to conclude that the Agreement barred Morais' claims. The district court rejected Morais' objections and granted summary judgment for defendants.
 
 
 7
 On appeal, Morais contends that the court erred in using state law and that, under applicable ERISA precedents, the Settlement Agreement does not serve as a valid waiver of his right to challenge the amount of his pension. He also argues that the district court erred in granting summary judgment for defendant Abacus, the plan administrator, and erroneously failed to consider his other claims. The defendants continue to maintain that the Settlement Agreement is a bar to Morais' renewed challenge to his pension amount, and they contend that the district court properly applied Rhode Island law to reach that conclusion. Although our analysis takes a different route from that of the district court, we reach the same conclusion and affirm its grant of summary judgment.
 
 II. Discussion
 
 8
 This case appears to have veered off course in multiple respects. Most central is that the district court (through the magistrate judge) applied Rhode Island law to construe the Settlement Agreement releasing Morais' ERISA-based claims, although it is well settled that federal common law applies both to interpret the provisions of an ERISA benefit plan and to resolve "[i]ssues of relinquishment of rights and waiver" when such side agreements affect the benefits provided by an ERISA plan, see Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 585, 587 (lst Cir.1993). See also Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (lst Cir.1995). Although state law principles are reflected in the federal common law, see Rodriguez-Abreu, 986 F.2d at 585, state law is itself preempted by ERISA in the context of interpreting employee benefit plans, see 29 U.S.C. § 1144(a)[3]; Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138-39, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). The relevant federal substantive law includes "the 'common-sense canons of contract interpretation' " derived from state law, see Rodriguez-Abreu, 986 F.2d at 585 (internal citations omitted), including the teaching that "contracts containing unambiguous language must be construed according to their plain and natural meaning," Smart, 70 F.3d at 178.
 
 
 9
 Because this case involves the release of ERISA benefits, the district court erred in utilizing state law. As we shall explain below, however, this error did not alter the outcome of the case. Indeed, Morais would not be entitled to any advantage afforded by federal law because he relied entirely on Rhode Island contract principles in his arguments to the district court. It is black letter law that issues not raised in the district court are waived, see, e.g., Sammartano v. Palmas del Mar Properties, Inc., 161 F.3d 96, 97 (lst Cir.1998) (" '[A] party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court.' ") (quoting United States v. Slade, 980 F.2d 27, 31 (lst Cir.1992)), and we typically would reject an appellant's request that we use a newly offered theory to analyze his case on appeal. We are, however, permitted to affirm a district court's grant of summary judgment on any ground supported by the record. Id. at 97 n. 2. Because federal law unquestionably governs this case, and because that law leads to the same result obtained by the magistrate judge, we choose to consider the particulars surrounding the Settlement Agreement using federal law principles.[4]
 
 
 10
 Our focus is the Settlement agreement, which the district court held to be a complete bar to Morais' claim to higher benefits. In reviewing a district court's grant of summary judgment, we scrutinize the record de novo and in the light most favorable to the party opposing the motion, indulging all reasonable inferences in that party's favor. American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 116 (lst Cir.1998). The non-movant, however, cannot simply rest on unsworn allegations; he "must establish a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.' " Id. (internal citations omitted).
 
 
 11
 Morais now argues that the Agreement must be given the "heightened scrutiny" that federal precedents require for waivers of ERISA pension benefits, see Rodriguez-Abreu, 986 F.2d at 587.[5] Under this law, courts are obligated to "scrutinize an ostensible waiver with care in order to ensure that it reflects the purposeful relinquishment of an employee's rights." Smart, 70 F.3d at 181. To determine whether a waiver is "knowing and voluntary," a court must examine the totality of the circumstances. Id. We have found helpful in this endeavor a set of six factors identified by the Second Circuit in Finz v. Schlesinger, 957 F.2d 78, 82 (2d Cir.1992).[6]
 
 
 12
 Morais contends that the record reveals a significant factual dispute concerning whether he freely and knowingly gave up his pension claims through the Agreement. He emphasizes in particular that he was on medication that impaired his judgment when he signed the document, that he was a common laborer with an eighth grade education confronting the company president, and that he was expected to sign the Agreement when it was presented to him without the opportunity for him to obtain advice from an attorney or any other independent source. These assertions implicate four of the six Finz factors: the plaintiff's education and business sophistication; the roles of employer and employee in determining the content of the waiver; the time plaintiff had to study the agreement; and whether plaintiff had independent advice.
 
 
 13
 The difficulty for Morais is that, on its face, the Agreement unambiguously speaks to at least two of these concerns. The document states that Morais consulted with attorneys and union officials "and has arrived at the decision to execute this Agreement after such consultation."[7] The Agreement thus both explicitly states that Morais had independent advice and implicitly states that he had access to the substance of the Agreement--if not the document itself--sufficiently in advance to discuss it with others.[8]
 
 
 14
 In the face of such unambiguous language, it would require a substantial departure from basic contract interpretation principles for us to validate Morais' self-serving effort, years later, to generate a factual dispute by asserting that he was isolated from all advisors and pressured into signing the Agreement. "As a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous.... In no event may extrinsic evidence be employed to contradict explicit contract language or to drain an agreement's text of all content save ink and paper." Smart, 70 F.3d at 179-80. Giving heightened scrutiny to ERISA waivers cannot mean abandoning these important principles, which are designed to preserve the integrity of contracts. Rather, when unambiguous language in the challenged waiver document directly refutes an employee's representation regarding the circumstances surrounding the waiver, the contract logically must take precedence, at least in the absence of competent evidence of the employee's incapacity at the time he signed the document. As we discuss infra, Morais failed to provide such evidence. His claim that he lacked independent advice is therefore without weight.
 
 
 15
 Unquestionably, the balance tips in the other direction with respect to the "education and business sophistication" factor. Morais' position as a laborer, and his lack of a high school education, put him at a presumed disadvantage in negotiating with the president of the company. This discrepancy in sophistication, however, is the very reason that advisors are crucial; the imbalance is neutralized by the fact that Morais--as stated in the Agreement--had outside guidance, including, notably, union representatives whose primary function is to equalize the mismatch between the employer and an individual employee.[9] As for the fourth of the factors listed above--the roles of the employer and employee in determining the content of the Agreement--the record reveals little. Although the document was prepared by the company, there is neither evidence about how its contents were developed nor evidence suggesting that the terms were unfair.
 
 
 16
 The remaining two Finz factors--the Agreement's clarity and the consideration--weigh heavily in favor of the Agreement's validity. Most of the document, which was only one page in length, is reproduced above, see supra at 710 & n. 7. The language is not challenging, even for someone with only an eighth-grade education, and it clearly discharges Central Beverage Corp., the Plan, and the Plan administrator from "all claims or causes of action whatever" arising out of his retirement "and the calculation of his disability pension."
 
 
 17
 The consideration, $5,000, is a substantial sum. Although Morais' attorney stated at the summary judgment hearing that the amount in dispute was $25,000, it appears unlikely that Morais' claim would have succeeded. His basic contention was that his lump sum workers compensation payment should have offset his monthly disability pension for only a single month instead of being pro-rated over many months, which effected a long-term reduction in his pension. The Plan states that
 
 
 18
 [a]ny disability pension benefits payable for any month for which workers' compensation benefits are payable to a Participant shall be offset by the amount of such workers' compensation benefits.
 
 
 19
 Plan Section 4.2(c)(i)(3) (as amended), App. At 75. Morais contends that the lump sum payment constituted benefits payable for only one month. To the contrary, that payment represented the benefits due him over a period of months, paid in advance. The language neither technically nor logically supports Morais' interpretation, which would allow a duplication of benefits that the Plan provision seems designed to avoid. We are therefore confident that the $5,000 settlement amount was ample consideration, even if, as Morais alternatively contended, there was a mistake in the computation.
 
 
 20
 Nor do the other circumstances in this case provide a basis for challenging the Settlement Agreement. The fact that Morais suffered from various disorders, including depression, and was on medication is insufficient, without more, to invalidate the Agreement. See Rivera-Flores, 112 F.3d at 12-13.[10] The note from his doctor does not support Morais' assertion that he experienced reduced mental capacity; the note simply lists his diagnoses and medication, without any description of his symptoms or possible side-effects from the medication. The record thus lacks "competent medical evidence going to his capacity to execute the release," id. at 13.
 
 
 21
 Morais also argues that the Agreement should not be enforced because he misunderstood its scope and did not expect it to cut off claims challenging the benefit reduction against the Plan, as well as against his employer.[11] Again, however, the Agreement itself deflates his argument. It explicitly states that all claims or causes of action against, inter alia, Central Beverage, its officers, the Central Beverage Corp. Union Employees' Supplemental Retirement Plan and its administrator are released and "forever discharge[d]." In the face of such clear and complete language, Morais' assertion of confusion is unavailing. See Smart, 70 F.3d at 179-80 & supra at 711.
 
 
 22
 Ultimately, the question we must answer is whether the record unequivocally demonstrates that Morais knew he was relinquishing a benefit and acted voluntarily in doing so. Taking the plain language of the document he signed in exchange for $5,000 at face value, such a conclusion is inevitable. We therefore affirm the district court's judgment that the Settlement Agreement bars this lawsuit.[12]
 
 
 23
 Affirmed.
 
 
 
 [1]
 The defendants are the Central Beverage Corp. Union Employees' Supplemental Retirement Plan; Abacus Benefit Consultants, the administrator of the Plan; and George Matta, Sr., who was both president of Central Beverage Corp. and a representative of the Plan administrator
 
 
 [2]
 The lump sum was pro-rated so that reductions would be made every month for an extended period. Morais argues that only a one-month reduction of his disability pension benefits should have occurred to offset the workers compensation payment. The difference in views is explained more fully infra at 711-712
 
 
 [3]
 Section 1144(a) provides for the preemption of all state law causes of action "insofar as they may now or hereafter relate to any employee benefit plan."
 
 
 [4]
 Another apparent misfiring in this litigation concerns the issue of exhaustion of plan remedies. There is no documentary evidence in the record that Morais followed the pension plan's dispute resolution procedures, which provide for an appeal of an adverse benefits decision within 90 days after the claimant receives written denial of his claim. See Central Beverage Corp. Union Employees' Supplemental Retirement Plan, Art. 8.1(e), App. at 60. It is well settled that there is a "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases," Alfarone v. Bernie Wolff Const. Corp., 788 F.2d 76, 79 (2d Cir.1986), and this court adheres to that requirement for contract-based claims, such as Morais', see Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821, 825-26 (lst Cir.1988). See also Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 418 (6th Cir.1998)(noting that ten circuits have read exhaustion requirement into ERISA for contract-based claims); McMahon v. Digital Equipment Corp., 162 F.3d 28, 39-40 (lst Cir.1998) (noting the rule). The district court did not address exhaustion, and the parties' attorneys made conflicting statements at the summary judgment hearing. Although it is the plaintiff's obligation to satisfy the exhaustion requirement, see Drinkwater, 846 F.2d at 825-26, we decline to dismiss the case for failure to exhaust in the absence of either an initial judgment by the district court or evidence other than the parties' arguments
 
 
 [5]
 Although Morais did not bring ERISA waiver law to the magistrate judge's attention, the defendants did note its applicability in their reply to Morais' opposition to their motion to dismiss. The judge concluded that that law was inapplicable because Morais did not waive any benefits, but simply agreed to release claims concerning the amount of his benefits. Our cases do not draw such a distinction. The discussion in Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9 (lst Cir.1997), for example, presumes that waivers and releases are subject to the same totality of the circumstances analysis to "ensure that they are 'knowing and voluntary.' " See id. at 11-12
 
 
 [6]
 The six factors, which are not exclusive, see Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 12 (lst Cir.1997), are: (1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver. See id. at 12 n. 4
 
 
 [7]
 The second paragraph of the Agreement states in full:
 Morais acknowledges that he has consulted with attorneys and with officials of Teamsters' Local Union No. 251 and has arrived at the decision to execute this Agreement after such consultation and in connection therewith he has instructed Teamsters' Local Union No. 251 to withdraw his grievance and demand for arbitration filed by it on his behalf with the Boston office of the American Arbitration Association.
 
 
 [8]
 At oral argument, Morais' attorney, who did not represent him in the district court, emphasized that the Agreement does not explicitly state that Morais consulted with his own attorney, and she notes that his affidavit states that the only attorney with whom he spoke was the company's lawyer, at Matta's suggestion. The Agreement, however, uses the plural, stating that he spoke with "attorneys." This wording suggests that he had contact with another attorney, presumably of his own choosing. In any event, there is no assertion that Morais was misled by the company attorney about the nature of the Agreement. And, more importantly, the Agreement states that he also had the opportunity to consult with the Union, giving him another source for independent advice
 
 
 [9]
 We recognize that relying on the presence of independent advisors to negate the importance of disparate education and business experience conflates those two elements in this case. That is a logical result when an employee has had access to outside advice. It is when an employee has not had such guidance that a disparity in education and business sophistication would be an independently significant factor
 
 
 [10]
 We acknowledged in Rivera-Flores that an assertion of disability may raise a question about whether an employee has the capacity to give a knowing and voluntary waiver, but indicated that the employee must establish lack of capacity with competent evidence. See 112 F.3d at 12-13
 
 
 [11]
 In his affidavit, Morais states in paragraph 7 that he was told by company president Matta "that the settlement agreement would be between myself and the Plan but, after signing the agreement I learned that it was between myself and Central." In paragraph 8, however, Morais states that he "did not understand that this agreement constituted a release of any claims that I might have had against the Plan since it was entitled 'Settlement Agreement' and was signed by George Matta, Sr. personally." These two assertions appear contradictory--one seeming to indicate that Morais thought the Agreement was with the Plan and the other seeming to indicate that he thought the Agreement was with his employer, represented by Matta as president. Presumably, since this action was brought against the Plan and not the employer, his actual position is that he hoped to preserve claims against the Plan
 
 
 [12]
 Our disposition requires dismissal of all three counts in his complaint ("Denial of Plan Benefits," "Breach of Fiduciary Duty," and "Intentional Infliction of Emotional Distress") because the Agreement released "all claims or causes of action whatever" arising out of his retirement and the calculation of his disability pension
 Morais also argued on appeal that, if the Agreement were valid, it should not bar claims against Abacus because the pension administrator was not a party to the Agreement. The Agreement, however, explicitly extends the release of pension-related claims to Abacus, and our ruling that the Agreement is enforceable therefore disposes of this issue as well.