# United States Court of Appeals
## For the First Circuit

Nos. 13-1167
     13-1186

NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC,
d/b/a FAIRPOINT COMMUNICATIONS,

Plaintiff-Appellant, Cross-Appellee,

v.

LOCAL 2327, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO,

Defendant-Appellee, Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Circuit Judge,
and Stearns,[*] District Judge.

Arthur G. Telegen, with whom John E. Duke and Seyfarth Shaw
LLP, were on brief for appellant/cross-appellee.
     Alfred Gordon O'Connell, with whom Pyle Rome Ehrenberg PC, was
on brief for appellee/cross-appellant.

November 12, 2013

[*]  Of the District of Massachusetts, sitting by designation.

**TORRUELLA, Circuit Judge.** This case asks us to review the appropriateness of an arbitral award entered against FairPoint Communications ("FairPoint") in favor of Local 2327, International Brotherhood of Electrical Workers, AFL-CIO (the "Union"). Fairpoint asserts, as it did in the court below, that the arbitral panel exceeded the scope of its authority in crafting the award, disregarding the express terms of the parties' Collective Bargaining Agreement ("CBA") and adopting a manifestly unreasonable interpretation of this agreement's terms. The district court disagreed, finding that the panel's interpretation fell within the wide boundaries of discretion granted to arbitral decisions by our courts and granting summary judgment in favor of the Union. Although the district court affirmed the award, it denied the Union's request for costs and fees. The parties now cross-appeal, both seeking review of the aspects of this decision contrary to their interests. Agreeing with the district court's determination -- albeit on different grounds as to the non-imposition of costs and fees -- we affirm.

## I. Background

### A. FairPoint's telecommunications operation

On April 1, 2008, FairPoint purchased Verizon New England, Inc.'s ("Verizon") telecommunications operations in Vermont, New Hampshire, and Maine. As a term of purchase, FairPoint agreed to hire all former Verizon employees, represented

by the Union, in those states.  FairPoint and Verizon negotiated a Transition Services Agreement under which Verizon's employees and systems remained active through February 1, 2009 (the "cutover date") so as to ensure continuity of service during the transfer of operations and ownership to FairPoint.

This appeal concerns FairPoint's Wholesale Group, which is responsible for facilitating the purchase of access to FairPoint's operational infrastructure and services by smaller, regional telecommunication operators.  These purchase orders are grouped into Access Service Requests ("ASRs"), which are complex orders requiring personal service, and Local Service Requests ("LSRs"), which are simple orders generally completed by an automated system, without human intervention.

At the time of FairPoint's purchase, 94% of Verizon's LSR orders were fully automated; only the remaining 6% of more complex LSR work was routed to employees.  FairPoint intended to complete a number of system upgrades prior to the cutover date, so as to match this 94% percent "flowthrough" rate by the time it took over Verizon's operations.  Consequently, FairPoint expected that only a small percentage of complex LSR work would be completed by Union employees.  Its original staffing plan included no reference to subcontracting.

As the cutover date approached, however, FairPoint realized that its flowthrough rate was significantly lower than

expected, only around 60%. It also became clear that the transition in ownership would require a ten-day "blackout period," during which all orders would be handwritten, resulting in a significant backlog. These unexpected obstacles created additional staffing needs not addressed by FairPoint's original staffing plan. FairPoint approached the Union and explained that it would need to hire a "bubble workforce" until the backlog created by the blackout period had been resolved and the flowthrough rate neared 94%. FairPoint estimated this would take between sixty days and six months.

Subsequently, FairPoint hired TeleTech, a Canadian company, to staff the bubble workforce. Beginning in February 2009, TeleTech staff handled simple LSR work -- the work that would have been otherwise fully automated -- while Union employees handled more complex LSR work.[1] Despite FairPoint's assurances that this bubble workforce was temporary, the simple LSR work was never allocated to Union employees. In September 2010, the work was indefinitely transferred from Teletech to APAC, a subcontractor located in Utica, New York.

---

[1] TeleTech originally completed some ASR work as well, although all of that work eventually returned to the Union and is not in dispute here. Some simple LSR work was also completed by Union employees based in Portland, Maine. This was usually as a result of FairPoint's "Single Point of Contact" program, which allowed clients to have all of their service needs, simple and complex, handled by a single representative.

**B. The Fairpoint-Union CBA**

When FairPoint purchased Verizon's telecommunication systems, it also succeeded to Verizon's CBA with the Union, originally signed in 2003. Under a provision titled "Limitations on Transfer of Jobs," this 2003 agreement held that: "a Company may not permanently transfer more than 0.7% of [Union] represented jobs . . . to an area outside the New England States []." As interpreted in a prior grievance arbitration -- filed by the Union in an attempt to arrest Verizon's sale of the company to FairPoint -- this restriction applied only to transfers "<u>between</u> Verizon entities," not transfers to external companies. <u>IBEW, System Council T-6 and Verizon New England</u>, Grievance #77-07 and 78-07 at 57-58.

Throughout February 2008, the Union negotiated with FairPoint to amend and extend this 2003 agreement. In its final version, the revised CBA deleted much of the language that had been subject to the earlier arbitration, replacing it with new terms:

> During each contract year of the parties' current collective bargaining agreement[] ("CBA"), from August 3, 2008 to August 3, 2013, the Company may not <u>permanently transfer</u> [Union] represented jobs to <u>any entity which is not a signatory to this agreement</u>.

Also incorporated into the revised CBA, however, was an agreement letter signed by Union and FairPoint representatives that referenced certain pre-amendment elements of the Limitation on Transfer of Jobs provision. In particular, this letter announced

a method for calculating the 0.7% transfer cap, despite this cap's deletion from the revised CBA.

At this same time, the parties negotiated amendments to a Memorandum of Agreement specifically focused on the sub-contracting of plant-technician jobs. This agreement, along with another, unmodified provision -- detailing FairPoint's ability to contract out certain other non-sales jobs -- appeared in a different section of the CBA from the Limitation on Transfer of Jobs provision.

## C. The arbitration

In 2010, the Union filed a grievance based on the allegedly wrongful transfer of LSR work. A panel of three arbitrators took up this grievance on October 27 and November 17, 2010, with both parties stipulating to the question for arbitration:

> Did the Company violate [the Limitation on Transfer of Jobs provision] of the April 1, 2008 collective bargaining agreement with regard to wholesale work being performed by employees of TeleTech or APAC? If so, what shall be the remedy?

FairPoint argued that no violation had occurred, citing the previous arbitration as evidence that the Limitation on Transfer of Jobs provision applied only to transfers between FairPoint owned-entities, making transfers to independent entities like TeleTech and APAC acceptable. FairPoint also claimed that, regardless of whether the panel interpreted "any entity . . . not

-6-

signatory to this agreement" to include non-FairPoint owned businesses, no transfer had ever occurred. Because Union employees never possessed the jobs in question -- under Verizon's ownership they were completed by an automated system -- FairPoint contended they could not have been "transferred" away.

The panel disagreed. As to the restriction on transfers to "any entity," it reasoned that "any" implied "the opposite of limitation." As such, the plain meaning of this provision restricted transfer to "any business, not just those affiliated with FairPoint." Moreover, the panel identified no evidence that the parties intended to retain the pre-amendment CBA's more limited restrictions on job transfer. It refused to hold that the other provisions of the CBA -- defining the scope of acceptable subcontracting for certain non-sales jobs -- were necessarily incongruous, expressing a belief that all three provisions could be interpreted in a consistent manner. Although recognizing that the agreement letter's reference to the since-deleted 0.7% transfer cap was clearly contradictory, the panel reasoned that it could not "disregard the plain language of the [Limitation on Transfer of Jobs provision] because of [this] apparent inconsistency with another provision."

Although the issue of whether jobs were indeed "transferred" gave the panel more pause, ultimately it concluded that the facts presented constituted just such a wrongful

conveyance.  First, the panel noted that FairPoint's staffing plan, shared with the Union, envisioned that all necessary LSR work would eventually be completed by Union employees.  Second, the panel determined that it was "not completely correct" to say that the Union never did any LSR work; testimony established some small amount of this work was completed by Union employees.  On these grounds, the panel found an "unmistakable mutual understanding and expectation" that the jobs in question would be completed by Union employees.  The panel concluded that this concrete, shared expectation was sufficient to make the allocation of this work to TeleTech and APAC a wrongful transfer of jobs.

The panel entered an award in favor of the Union, requiring FairPoint to return all LSR work and to rehire any Union employees wrongfully laid off during the relevant time period.

**D. The district court's opinion**

FairPoint filed suit in district court under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, arguing that the arbitral panel had exceeded its authority by wrongfully adding and subtracting terms from the CBA. Specifically, FairPoint asserted that the panel's interpretation of the Limitation on Transfer of Jobs provision impermissibly stripped FairPoint of management rights expressly afforded to it by the CBA and could not be reconciled with the CBA's other subcontracting provisions.  It also restated the argument that no transfer had

occurred, the jobs in question having never been possessed by Union employees. The Union cross-filed, seeking an award of costs and fees for what it asserted was spurious litigation.

The district court granted summary judgment in favor of the Union, finding that FairPoint's arguments established only a disagreement with the panel's interpretation of the CBA, not proof that such an interpretation was in excess of the panel's authority. Nonetheless, the district court denied costs and fees pursuant to Federal Rule of Civil Procedure 11, reasoning that the Union had failed to properly abide by the rule's provisions and that, regardless, sanctions were inappropriate in this case. These cross-appeals followed.

## II. Discussion

### A. FairPoint's request to vacate the award

Review of a district court's decision to grant summary judgment affirming an arbitral award is plenary. Teamster Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 65 (1st Cir. 2000). Yet, "[c]ourts [] do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does reviewing decisions of lower courts." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987). Rather, judicial review of arbitration awards is "among the narrowest known in law." Me. Cent. R.R. Co. v. Bhd. of Maint. of Way Emps., 873 F.2d 425, 428 (1st Cir. 1989).

Our review, therefore, adopts the same highly deferential standard as did the court below.  See Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  Moreover, "an arbitrator's factual findings are not open to judicial challenge." El Dorado Technical Servs., Inc. v. Unión Gen. de Trabajadores de P.R., 961 F.2d 317, 320 (1st Cir. 1992).  Instead, we accept the arbitrator's factual conclusions, Bos. Med. Ctr. v. Serv. Emps. Int'l Union, Local 285, 260 F.3d 16, 18 (1st Cir. 2001), and limit our review to "determining if the arbitrator's interpretation of the contract is in any way plausible,"  Labor Relations Div. of Constr. Indus., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Local No. 379, 29 F.3d 742, 745 (1st Cir. 1994); see also Misco, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.").

It is through this exceedingly narrow lens that we assess the appropriateness of the FairPoint-Union arbitral award.

**1. Scope of the panel's authority**

FairPoint first asserts that the panel acted in excess of the authority granted to it by the CBA's arbitration clause.  This clause provides that an arbitrator "shall have no power to add to, subtract from, modify or disregard any of the provisions of this

agreement."  FairPoint purports that this provision raises the standard of our review, requiring us to reject even plausible interpretations of the CBA that exceed this "express limitation[]" on an arbitrator's authority.

This argument asks too much of the broadly worded arbitration provision in question.  In interpreting a provision of similar generality,[2] we have recognized that a "standard 'no modification' clause incorporates general legal principles concerning an arbitrator's authority, reinforcing the admonition . . . that legitimate arbitral awards draw their essence from the contract."  Kraft Foods, Inc. v. Office & Prof'l Emps. Int'l Union, AFL-CIO, CLC, Local 1295, 203 F.3d 98, 101 (1st Cir. 2000) (internal alteration and quotation marks omitted) (quoting LaRocque v. R.W.F., Inc., 8 F.3d 95, 97 (1st Cir. 1993)).  That an award "must draw its essence from the contract," Misco, 484 U.S. at 38, is simply a reiteration of our requirement, described above, that the interpretation be in some way "plausible."  Labor Relations Div. of Constr. Indus., 29 F.3d at 745 (citing Misco, 484 U.S. at 36-38).  As such, without foreclosing the possibility that the text of some arbitration clauses might "limit an arbitrator's power of

---

[2]  That clause stated: "'[t]he arbitrator shall have no authority to amend, alter, or modify this Agreement or its terms and shall limit the decision solely to the interpretation and application of this Agreement.'"  Kraft Foods, Inc. v. Office & Prof'l Emps. Int'l Union, AFL-CIO, CLC, Local 1295, 203 F.3d 98, 101 (1st Cir. 2000).

contract construction to a greater extent than the background law,"
Kraft Foods, Inc., 203 F.3d at 101 n.1, we find that the generic
no-modification provision in question evidences no intent to
circumscribe the arbitrator's authority beyond our accepted
standard.[3]

### 2. The ban on subcontracting to "any entity"

In any case, FairPoint struggles to identify precisely
how the panel's decision on subcontracting veered over the line
separating interpretation and modification.  In sum, FairPoint
forwards two arguments in support of its claim.  First, it notes
that the CBA grants it an express right to "manage its business
subject [only] to the limitations contained in [the CBA]."  By
restricting subcontracting, FairPoint asserts that the arbitrator
wrongly "subtract[ed] from" this right by "add[ing]" additional
restrictions not clear on the CBA's face.  Second, it argues that
the CBA's specific restrictions on subcontracting certain plant
jobs imply that the parties knew how to explicitly limit
subcontracting and would have done so for sales jobs if so desired.
Moreover, interpreting the Limitation on Transfer of Jobs provision
to create a blanket ban on subcontracting would render these
provisions superfluous, in violation of a basic rule of contract

---

[3]  We would be hard-pressed to identify an instance in which an
"interpretation" that in fact disregarded express contract terms,
or created additional terms from thin air, would be found
"plausible."

interpretation.  FairPoint contends, therefore, that the panel clearly "disregard[ed]" these specific provisions and impermissibly "add[ed]" an overly broad restriction to the CBA.

Certainly, the narrow nature of our review does not amount to a blank check.  United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960) ("[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.").  Yet, considering these arguments in turn, we are unable to identify any instance in which the panel exceeded the bounds of its interpretative powers.

As to the management rights provision, we see no contradiction between its terms and the arbitrator's interpretation of the Limitation on Transfer of Jobs provision.  The former provision grants FairPoint control over all management decisions, save those limited by other provisions of the CBA.  The panel interpreted the latter provision, in a manner not expressly foreclosed by anything in the CBA, as one such limitation.  In reaching this conclusion, the panel neither "disregarded [] the lack of restrictions on FairPoint's ability to subcontract" nor "added subcontracting restrictions."  It simply read one provision as creating an exception to another that, by its terms, allowed for just such exceptions.  This is not the stuff of which vacated arbitral awards are made.

On a review of the record, neither can we agree that the arbitral panel manifestly disregarded the other CBA provisions limiting subcontracting for particular plant jobs. The panel explicitly stated that "it would be possible to interpret the [] two [specific restrictions] as exceptions to the broad jobs prohibition of the [CBA]."[4] It also directly considered the inconsistency between the Limitation on Transfer of Jobs provision and the agreement letter, but ultimately concluded that it could not "disregard the plain language of the [CBA]." In reaching this conclusion, the panel relied heavily on the parties' apparent intent. It highlighted the parties' extended negotiations regarding the Limitation on Transfer of Jobs provision, during which they undisputedly deleted the 0.7% cap and removed other language that had previously been interpreted as restricting only transfers between Verizon-owned entities.

While finding it "hard to fathom" why this letter was executed as written, the panel reasoned that the parties' bargaining history made clear their intent to construct a more

---

[4] The provisions in question are indeed worded so as to plausibly create exceptions to an otherwise total ban. For instance, one provision states that "under the following conditions work may be contracted out," while the other states that "[t]he Company will maintain its established policies as to assignment of work in connection with the installation and maintenance of communications facilities." Both, therefore, could be interpreted as granting a greater power to subcontract in certain specific instances than was permitted under the more general Limitation on Transfer of Jobs provision. While perhaps this was not the best interpretation, neither can we deem it a wholly implausible one.

-14-

comprehensive ban on job transfers than that of the pre-amendment CBA. In light of this mutual intent, the panel was unwilling to allow a letter -- incorporated into the CBA but apparently based erroneously on a since-amended version of its text[5] -- to prevail over the express terms of the current provision.

Ideally, the panel's discussion of these points would have been more robust, and we are not untroubled by its contention that a more thorough attempt to harmonize these provisions "would be rash." Still, we are not tasked with reviewing the intricacies of these provisions anew, but only with determining if the panel's resolution supplants express contract terms with "[its] own brand of industrial justice." Id. On the whole, the panel's decision that these apparent inconsistencies could not overwrite the plain meaning of the phrase "any entity" -- bolstered as it was by the parties' bargaining history and apparent intent -- does not appear wholly contrary to either basic reason or rules of contract interpretation. See Smart v. Gillete Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995) (stating that contract interpretation looks first to the text's plain meaning and, if ambiguity exists, then to the parties' intent).

---

[5] We express no conclusive opinion as to whether, in fact, the parties simply erred by not updating this letter, but we note that its text also includes reference to "the December 2000 bargaining sessions." Because the Union and FairPoint's negotiations occurred in 2008, this lends plausibility to the panel's suggestion that the text mistakenly referenced the prior CBA.

Ultimately, FairPoint's arguments in regard to subcontracting express disagreement with the panel's interpretation of the CBA, suggesting an alternative interpretation that it believes is more appropriate. These arguments do not establish, however, that the panel's interpretation was either implausible or in excess of its authority.

### 3. The meaning of "transfer"

FairPoint next contests the panel's decision that jobs once completed by a computer program were wrongfully "transferred" away from Union employees. It asserts, as it did before the court below, that the only plausible interpretation of "transfer" requires an element of predicate possession that was absent in this case. Therefore, FairPoint concludes, the panel's determination that jobs were impermissibly transferred away from Union employees "ignores the plain language" of the CBA in favor of an impermissible construction that is clearly in excess of the panel's interpretive authority.

We do not disagree that the term "transfer" connotes an assignment from one entity to another. See Webster's Third New International Dictionary 2426-27 (1971) (defining "transfer" as "to carry or take from one person or place to another" or "the conveyance . . . from one person to another" (emphasis added)). Therefore, we must review the facts presented in this case to determine whether, given this definition, the panel's finding that

a transfer occurred was indeed plausible.  We begin this review by adopting the panel's factual findings in full, including the determination that the Union had a concrete expectation, amounting to a "legitimate claim," that its employees would perform these jobs.  El Dorado Technical Servs., Inc., 961 F.2d at 320 (holding that courts, in considering arbitral awards, do not review findings of fact).  Our inquiry is thus limited to determining whether it is conceivable that this "legitimate claim" vested in the Union a degree of possession sufficient to make the subcontracting of these jobs a form of transfer.

The panel's interpretation of "transfer" is indeed expansive, and if we were initially tasked with construing the meaning of this term, we might find FairPoint's argument more convincing.  We cannot say, however, that it is beyond any plausible interpretation of the term as used in the CBA that subcontracting jobs to which Union employees had a "legitimate claim" -- undisputedly founded on a mutual understanding of the parties -- constituted a "transfer."  It is at least conceivable that this well-defined expectation was a sufficient form of predicate possession to mean that these jobs were indeed removed or conveyed away from the Union. See Local 1445, United Food & Commercial Workers Int'l Union, AFL-CIO v. Stop & Shop Co., Inc., 776 F.2d 19, 21 (1st Cir. 1985) (finding that to warrant reversal, awards must be premised on reasoning "so palpably faulty" that no

judicial body "ever could conceivably have made such a ruling" (citing Bettencourt v. Bos. Edison Co., 560 F.2d 1045, 1050 (1st Cir. 1977))). The plausibility of this reading is further bolstered by the panel's factual finding that some small portion of LSR work was already completed by Union employees.

That FairPoint contracted to resolve disputes via arbitration means they must now live by the bargain they struck. Misco, 484 U.S. at 37-38 ("Because the parties have contracted to have disputes settled by an arbitrator . . . it is the arbitrator's view of the . . . meaning of the contract that they have agreed to accept."). Finding no grounds on which to vacate the arbitral award, we affirm the district court's grant of summary judgment for the Union.

## B. The Union's request for costs and fees

A district court's decision to grant or deny a request for costs and fees is reviewed for a "manifest abuse of discretion." Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001). Here, the district court assessed the Union's request under Federal Rule of Civil Procedure 11 ("Rule 11"), apparently not recognizing that an award of costs and fees is available as a matter of federal common law for actions proceeding under § 301 of the LMRA. See Local 2322, Int'l Bhd. of Elec. Workers v. Verizon New England, Inc., 464 F.3d 93, 100 (1st Cir. 2006). It is well accepted that "a court's material error of law

-18-

is invariably an abuse of its discretion." Negrón-Almeda v. Santiago, 528 F.3d 15, 25 (1st. Cir. 2008). Therefore, the district court's determination not to award costs and fees based on the Union's failure to "cite Rule 11 or comply with its requirements" was in error.

The district court went on, however, to hold that even had the Union complied with the procedural requirements of Rule 11, it would have, "in its discretion," denied the request "to award fees and costs as a sanction on the record presented." Because the standard for awarding costs and fees under Rule 11 is substantially the same as that of section 301 actions, compare Fed. R. Civ. P. 11 (allowing courts to apply sanctions in the case of "frivolous" arguments), with Local 2322, Int'l Bhd. of Elec. Workers, 464 F.3d at 100 (allowing for an award of costs and fees where arguments are "frivolous, unreasonable, or without foundation"), the district court's error appears, for all practical purposes, devoid of materiality. Consequently, we review the district court's latter holding, denying an award of costs and fees based on its review of the record, for an abuse of discretion.

The Union asserts that an award of costs and fees is necessary to avoid the continued filing of frivolous litigation seeking to overturn arbitral awards. It requests that this court assign costs and fees as a means by which to deter potential

litigants, lest we be continually inundated with what the Union styles as wholly frivolous claims.

Undisputedly, this court has long lamented the "exasperating frequency" with which arbitration awards are appealed. See Posadas de P.R. Assocs., Inc. v. Asociación de Empleados de Casino de P.R., 821 F.2d 60, 61 (1st Cir. 1987). Here, however, FairPoint's claims do not appear wholly "frivolous, unreasonable, or without foundation." Local 2322, Int'l Bhd. of Elec. Workers, 464 F.3d at 100. The line between frivolous arguments and merely unpersuasive ones is fine, and while FairPoint was ultimately unsuccessful, its contention that the panel impermissibly modified, rather than interpreted, the CBA was "at least colorable." Id. On this basis, we will not usurp the district court's discretion by awarding costs and fees it chose to deny.

### III. Conclusion

For the foregoing reasons we affirm.

**Affirmed.**

-20-