Gregory W. **WALKER** and Eugene A. **Spellman, on Behalf of Themselves and All Other Persons Similarly Situated, Plaintiffs,**

v.

**ASEA BROWN BOVERI, INC. Cash Balance Pension Plan and Asea Brown Boveri Inc., Defendants.**

No. 3:02–CV–550(AVC).

United States District Court, D. Connecticut.

Feb. 25, 2003.

Allen C. Engerman, Law Offices of Allen C. Engerman, PA, Boca Raton, FL, for plaintiffs.

Glenn William Dowd, Suzanne Garrow, Day, Berry & Howard Cityplace, Hartford, CT, Brian T. Ortelere, Stephen D. Spencer, Kay Kyungsun Yu, Jeremy P. Blumenfeld, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for defendants.

### RULING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

COVELLO, District Judge.

This is a proposed class action seeking damages to redress alleged violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001. The complaint alleges that the defendants' distribution of lump sum benefits to the named plaintiffs, and other proposed class members, violated ERISA § 204(c)(3), 29 U.S.C. § 1054(C)(3)[1], which provides that a lump sum distribution "shall be the actuarial equivalent" of the annuity commencing at normal retirement age, as well as the requirement of I.R.C. § 417(e), 26 U.S.C. § 417(e)[2], which provides that "the present

---

**1.** 29 U.S.C. § 1054(c)(3) provides:

For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2) [of this subsection].

**2.** 26 U.S.C. § 417(e) provides, in pertinent part:

(3) Determination of present value.

(A) In general.

(i) Present value. Except as provided in subparagraph (B), for purposes of paragraphs (1) and (2), the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate.

(ii) Definitions. For purposes of clause (i)—

(I) Applicable mortality table. The term "applicable mortality table" means the table pre-

value shall not be less than the present value calculated by using" the actuarial assumptions prescribed in § 417. The complaint further alleges that the defendants' distribution of lump sum benefits violated the terms of the Asea Brown Boveri Inc. Cash Balance Pension Plan (the "Plan") itself. Additionally, or in the alternative, the complaint alleges that the Plan violated the nonforfeitability requirements of ERISA § 203(a)(2), 29 U.S.C. § 1053(a)(2); I.R.C. § 411(a)(2), 26 U.S.C. § 411(a)(2); and, Treas. Reg. § 1.411(a)–4. Additionally, or in the alternative, the complaint alleges that the Plan violated the anti-cutback rule of I.R.C. § 411(d)(6). The plaintiffs now move for class certification pursuant to Fed.R.Civ.P. 23.

The issues are: 1) whether the four prerequisites for class certification in Fed. R.Civ.P. 23(a) have been satisfied; and, 2) if so, whether at least one of the additional criteria required by Fed.R.Civ.P. 23(b) is also present.

For the reasons hereinafter set forth, the court concludes that: 1) the plaintiffs have not met their burden of establishing that all four prerequisites for class certification have been satisfied, particularly the typicality requirement; and, 2) as a result, the plaintiffs can not establish that one of the additional requirements of Rule 23(b) has been met. Accordingly, the plaintiffs' motion for class certification is DENIED.

### FACTS

Examination of the complaint, briefs on the issue of class certification, and the accompanying exhibits, discloses the following facts:

The named plaintiffs, Gregory W. Walker and Eugene A. Spellman, are residents of Ohio who retired from Asea Brown Boveri Inc., also known as ABB Inc. ("ABB") in Columbus, Ohio. Walker and Spellman participated in the Asea Brown Boveri Inc. Cash Balance Pension Plan (the "Plan"). Upon retirement, each elected to receive his pension benefits under the Plan in a lump sum distribution. On July 1, 1998, Walker received a lump sum distribution in the amount of $36,310. On April 1, 1998, Spellman received a lump sum distribution in the amount of $94,225.

On December 15, 1997, Spellman signed a general release of liability in favor of ABB. On April 1, 1998, Walker also signed a general release. The Walker release differs from the Spellman release in three respects. The name and the date differ, as does the "Governing Law" provision. The Spellman release indicates that the agreement shall be governed by the laws of Ohio, whereas the Walker release, though it does include a "Governing Law" provision, fails to specify a state whose law governs the agreement.[3] Otherwise, the agreements each provide, in part, that:

> You hereby release and discharge ABB Industrial Systems, Inc. and all of its past, present and future officers, directors, agents, employees, shareholders, parent, subsidiary and affiliated corporations, and employee benefit plans, of and from all manner of actions, suits, claims, and demands whatsoever, in law or equity, whether known, or unknown, which you ever had, now have, or may hereafter have against them for, or by reason of, any matter, cause or thing arising out of your employment with or separation from ABB Industrial Systems Inc.

ABB is a Delaware corporation with its principal place of business in Norwalk, Connecticut. On January 1, 1992, ABB established the Plan. ABB is the administrator of the Plan. The Plan covers salaried and hourly employees of ABB.

---

scribed by the Secretary. Such table shall be based on the prevailing commissioners' standard table (described in section 807(d)(5)(A)) used to determine reserves for group annuity contracts issued on the date as of which present value is being determined (without regard to any other subparagraph of section 807(d)(5)).

(II) Applicable interest rate. The term "applicable interest rate" means the annual rate of interest on 30–year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe.

**3.** Instead, the "Governing Law" provision of the Walker release provides: "This agreement shall be governed by the laws of the state of *State*."

The Plan is a defined benefit pension plan. The Plan defines the term "Cash Balance Account" as "[a]n account maintained on the books of the Plan for each Member, reflecting amounts credited to him" under the Plan. The Plan further provides that the cash balance account is a hypothetical account which does not create property rights in the Plan participants to specific funds or assets. Specifically, the Plan provides: "[t]he Cash Balance Account is a recordkeeping entry maintained by the Plan so that the Accrued Benefit of such Member may be determined. The Cash Balance Account is not an individual account and no Plan contributions, earnings, or losses are allocated to it."

In 1992, when ABB established the Plan, the Plan credited each participant with a "beginning Cash Balance Account" which consisted of "[t]he lump sum present value of the Active Member's Accrued Benefit under the Prior ABB Plan as of December 31, 1991."

"Regular credits" (i.e., work credits) are credited to a participant's Cash Balance Account each year, at a rate of 2.5—8.75 percent of compensation, depending on the participant's age and salary. Each participant's account is credited with an annual interest credit, the "Cost of Living Escalator Percentage," which is credited as a percentage of a participant's existing Cash Balance Account. That is, a participant's Cash Balance Account is increased, each year, by a percentage of the value of the account from the prior year. The Plan provides that the interest crediting rate is the lesser of the consumer price index ("CPI"), or the one-year treasury constant maturities ("Treasury Rate"). According to the Plan, regardless of these rates, the Cost of Living Escalator Percentage rate is subject to a 4 percent minimum.

ABB, as plan sponsor, amended the Plan several times to provide that the Cost of Living Escalator percentage would be 8 percent, or more recently in 2001, 6.7 percent, regardless of the CPI and Treasury Rate. ABB contends that each time that it amended the Plan, it did so only for that year, but not for subsequent years.

The Plan gives participants a number of options for receiving their benefits. Participants can elect to receive a lifetime annuity (a constant monthly stream of payments for the participant's life), a joint and survivor annuity (a constant monthly stream of payments for the participant's life, with a reduced benefit for a spouse after the participant's death), or a lump sum benefit. ABB indicates, that because the Cost of Living Escalator Percentage in any future year is based on the CPI or Treasury Rate in the future, it is not possible to determine exactly what a participant's retirement benefit will be in the future, i.e., at age 65. As a result, if a participant elects a lump sum benefit, the Plan provides that the value of the benefit will be determined by projecting the Cash Balance Account forward to age 65 by applying an interest rate used by the Pension Benefit Guarantee Corporation (the "PBGC Rate").

The value of the benefit at age 65 is then discounted to present value at the same PBGC rate (taking into account the time value of money) to determine the participant's lump sum benefit. Because the same rate is used to project the Cash Balance Account forward to normal retirement age and then to discount it to present value, the lump sum benefit equals the cash balance account. The methodology for calculating the lump sum benefit payable under the Plan has not varied since the Plan's inception.

Essentially, the complaint alleges that the defendants violated ERISA and the Internal Revenue Code (the "I.R.C."), because they issued lump sum pension distributions that were less than the minimum distributions required by statute. The complaint alleges that ERISA and the I.R.C. require that the Plan participant's cash balance must be projected forward so as to convert it into an annuity commencing at the normal retirement age, using the interest credit rate provided in the Plan *or* established by a pattern of repeated amendments thereto. Next, the Plan must calculate the present value of the annuity, using actuarial assumptions as provided by statute. ERISA and the I.R.C. require that a lump sum distribution shall

not be less than the minimum amount calculated in this manner.

Here, the complaint alleges that the defendants did not make the required calculations, but simply distributed a portion of the participants' cash balance as a lump sum distribution. The plaintiffs contend that the Plan is obligated to use the Cost of Living Escalator Percentage Rate, as amended by the Plan, of 8 percent (not the PBCG rate provided in the Plan) when projecting a participant's Cash Balance Account forward to determine the lump sum distribution. As a result, the plaintiffs assert that the Plan's lump sum distributions are less than the minimum amount calculated in accordance with ERISA.

The plaintiffs seek to bring this suit as a class action. The plaintiffs propose the following class: "all vested participants in the Asea Brown Boveri Inc. Cash Balance Pension Plan who retired or were terminated from employment on or after January 1, 1992 and received their pension benefits under the Plan in the lump sum form of payment."

### STANDARD

To maintain a class action, the plaintiffs have the burden of establishing the prerequisites set forth in Fed.R.Civ.P. 23(a). *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 407, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). Fed.R.Civ.P. 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In order to qualify as a class, all four elements of Rule 23(a) must be satisfied. *Con-*

4. Here, the named plaintiffs contend that the class meets the criteria set forth in Rule 23(b)(3). Rule 23(b)(3) provides, in part:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

*sol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 482–84 (2d Cir.1995); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992). A court has broad discretion in determining whether a particular action complies with Rule 23(a), *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir.1993); however, a court may not certify a proposed class unless "it is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

In addition, the moving party must establish that the proposed class is maintainable because it fits within one of the categories specified in Rule 23(b).[4] *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 484 (2d Cir.1995) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992)).

### DISCUSSION

The plaintiffs propose a class consisting of "all vested participants in the Asea Brown Boveri Inc. Cash Balance Pension Plan who retired or were terminated from employment on or after January 1, 1992 and received their pension benefits under the Plan in the lump sum form of payment." The defendants argue that the court should not certify the proposed class because the plaintiffs have not met their burden of proving the requirements of Fed.R.Civ.P. 23(a), nor have they established that the class is maintainable under Fed.R.Civ.P. 23(b).

### A. Rule 23(a)

#### 1. Numerosity

■ In determining whether a plaintiff has met his burden under Rule 23(a)(1), a court must consider whether the claims are so numerous that "joinder would be impracticable." Impracticable does not mean impos-

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

sible, but simply difficult or inconvenient. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). In assessing numerosity, a court may make "common sense assumptions," and a plaintiff need not provide a "precise quantification of the class." *Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y.2000) (citing *LeGrand v. New York City Transit Auth.*, 1999 U.S. Dist. LEXIS 8020, *8, No. 95–CV–0333, 1999 WL 342286, *3 (E.D.N.Y. May 26, 1999)).

The plaintiffs assert that the proposed class satisfies the numerosity requirement because "[t]he class consists of all Plan participants who received lump sum distributions of their pension benefits since January 1, 1995, numbering at least in the hundreds." On October 11, 2002, the defendants stipulated that "[t]he putative class, as defined in plaintiffs' Complaint at ¶ 7, numbers at least 8,000 individuals, assuming the remaining elements of Rule 23 are satisfied."

As a result, the court concludes that the class of individuals who may assert this claim against the defendants is potentially numerous enough to make joinder impracticable. *See, e.g., Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (numerosity presumed at level of forty members).

### 2. Commonality

■ Commonality looks to whether there are common issues of law or fact among the proposed plaintiffs. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987).

The plaintiffs assert that the following primary issues are common to the class:

(a) whether defendants' distributions of lump sum benefits to the named plaintiffs and other class members violated the requirement of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), that a lump sum distribution "shall be the actuarial equivalent" of an annuity commencing at normal retirement age;

(b) whether defendants' distributions of lump sum benefits to the named plaintiffs and other class members violated the requirement of I.R.C. § 417(e), 26 U.S.C. § 417(e), that a lump sum distribution shall not be less than the present value of the annuity commencing at normal retirement age, calculated by using the actuarial assumptions prescribed in § 417; and

(c) whether defendants violated Section 1.01 of the Plan (and applicable provisions of ERISA and the I.R.C.) by issuing distributions that were less than the participants' "accrued benefits" determined in accordance with that section.

The plaintiffs assert that because these issues involve common questions of law and fact, the commonality requirement has been met.

On October 11, 2002, the defendants stipulated that "[s]ince the inception of the Asea Brown Boveri Cash Balance Pension Plan, the methodology for calculating the lump sum benefit payable under paragraph 8.03(b)(3) has been uniform." Because the three primary issues articulated by the plaintiffs relate to the calculation and distribution of lump sum pension benefits and because the defendants agree that the calculation methodology at issue has not varied since the Plan's inception, the court concludes that the plaintiffs have satisfied the commonality requirement.[5]

### 3. Typicality

"Typicality ... requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (citation omitted). "Minor conflicts, however, do not make a plaintiff's claims atypical; it is when the conflict goes to the very subject matter of the

---

5. The defendants note that even if the plaintiffs demonstrate that common questions of law and fact exist, because the plaintiffs moved for class certification pursuant only to Fed.R.Civ.P. 23(b)(3), the plaintiffs must prove that common questions predominate over any individualized issues.

litigation that the conflict will defeat the claim of representative status." *Walsh v. Northrop Grumman Corp.*, 162 F.R.D. 440, 445 (E.D.N.Y.1995). "While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir.2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) (internal citation omitted)).

The plaintiffs assert that the typicality requirement is met because the claims of the named plaintiffs are typical of the claims of other class members because all of the claims arise from "the same course of events," and all class members assert the same legal claims.

The defendants respond that the named plaintiffs' claims are not typical of the claims of the vast majority of the putative class members because of the unique circumstances surrounding the claims of the named plaintiffs. The defendants assert that the named plaintiffs' circumstances are unique for the following reasons: (a) the named plaintiffs executed releases waiving all claims against defendants, they offered no evidence that the putative class members also executed such releases, and an individualized inquiry is necessary to determine whether each plaintiff's release is enforceable; (b) the named plaintiffs exhausted their administrative remedies under the Plan, assuming they were required to so, but the putative class members did not; (c) the named plaintiffs' claims are barred by the statute of limitations, but the claims of at least some of the putative class members likely are not; and, (d) because relevant statutes upon which their claims are based were amended on December 31, 1994, the named Plaintiffs' claims are subject to a different legal framework than the claims of those putative class members who received their lump sum benefits prior to December 31, 1994. As a result of these distinctions between the claims of

the named plaintiffs and those of the putative class members, the defendants argue, the named plaintiffs' claims are not typical of those of the class.

### General Releases

The defendants argue that the named plaintiffs are not adequate representatives, nor are their claims typical of the putative class members' claims, because the named plaintiffs executed general releases waiving all claims against the defendants. The defendants cite to the following language from the release:

> You hereby release and discharge ABB Industrial Systems, Inc. and all of its past, present and future officers, directors, agents, employees, shareholders, parent, subsidiary and affiliated corporations, and employee benefit plans, of and from all manner of actions, suits, claims, and demands whatsoever, in law or equity, whether known, or unknown, which you ever had, now have, or may hereafter have against them for, or by reason of, any matter, cause or thing arising out of your employment with or separation from ABB Industrial Systems Inc.

The defendants argue that because the court would need to individually analyze whether such a release is enforceable so as to preclude a plaintiff from even bringing such an action, the claims of these plaintiffs are not typical of the class. To determine whether the release is valid, the defendants argue, the court must determine if each plaintiff knowingly and voluntarily waived his right to participate in a pension plan governed by ERISA. Because an individualized fact specific inquiry is required to determine whether each of the plaintiffs knowingly and voluntarily waived his pension claims by virtue of having signed the general releases, the defendants argue that the plaintiffs' claims are not typical of those of the class.

In response, the plaintiffs first argue that consideration of affirmative defenses is outside of the court's inquiry under Rule 23. The court disagrees with this proposition. Because "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," *Baffa v.*

*Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990) (internal citation omitted)), the court will consider the defendants' arguments regarding the analysis necessary to determine whether the releases are enforceable.

█ Second, the plaintiffs argue that the release language at issue cannot reasonably be construed as a knowing and voluntary waiver of pension benefits protected by ERISA. They argue that the agreements were not arms-length transactions between the plaintiffs and the defendants. The named plaintiffs signed the releases at the same time as their severance agreements, which the defendants rely upon as providing consideration for the releases. The named plaintiffs each signed identical documents, except for the names and dates, and governing law provision. As such, the plaintiffs characterize these documents as standard form agreements that the plaintiffs signed as they were losing their jobs and in exchange for enhanced severance benefits.

The plaintiffs also point the court to specific language, which they characterize as threatening language, that advised the plaintiffs that they would be entitled to a maximum total of four weeks severance eligibility if they failed to execute properly the general release of liability. Essentially, the plaintiffs argue that the circumstances under which they signed the severance agreements and releases did not provide either with an opportunity to negotiate the terms of the agreement, and therefore the court could not possibly conclude that the plaintiffs knowingly and voluntarily executed the agreements.

In addition, the plaintiffs argue that the terms of the agreement preclude any argument that the release language bars the employee from enforcing his right to pension benefits under the Plan. If the agreement did bar any such claim, then the employee would be barred from bringing any suit to recover unpaid pension benefits; however, they argue, the plan itself assured the employee that he would receive full pension benefits. To support this proposition, the plaintiffs cite to language from the agreement that directs the employee to further information regarding the plan:

> Distribution options and explanations of benefits for the PRISM Plan and the Cash Balance Pension Plan will be sent to you in the near future. Should you have any questions regarding these two benefit plans, you can contact the ABB Pension and Savings Service Center at 1–800–354–8069.

As a result of this express term and the requirement that a court apply close scrutiny in the analysis of a waiver of pension benefits, the plaintiffs argue that they cannot reasonably be construed to have released their rights to pension benefits under the Plan.

The court perceives the plaintiffs' argument as an invitation to proceed into the merits of the general release issue. This is an inquiry that the court is unwilling to approach at this juncture. *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999) ("a motion for class certification is not an occasion for examination of the merits of the case.")

Instead, the court finds that a fact-specific inquiry will be necessary to determine whether either of the named plaintiffs knowingly and voluntarily waived their rights to pension benefits under the Plan. The validity of an individual's waiver of pension benefits is subject to closer scrutiny than his or her waiver of general contract claims. *Finz v. Schlesinger,* 957 F.2d 78, 81 (2d Cir.1992), *cert. denied,* 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992) (citing *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan,* 935 F.2d 1360, 1365 (2d Cir.1991)). The court is required to closely inspect the totality of the circumstances surrounding a waiver of ERISA benefits. *Id.* (citing *Laniok,* 935 F.2d at 1367). This analysis requires an examination of the following factors:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5)

whether the plaintiff was represented· by or consulted with an attorney, [as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so] and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* at 82.

First, the court concludes that determining whether either of the named plaintiffs knowingly and voluntarily waived his right to bring a claim for pension benefits will necessarily require a fact-specific inquiry. Because other courts have found that an individual can waive his right to bring an ERISA claim by signing a general release,[6] and more specifically by signing a general release in connection with a severance agreement,[7] the court disagrees with the plaintiffs' contention that the court could not possibly conclude that the plaintiffs did waive their rights to bring such a claim in this case.

Next, the court is unaware of how many of the putative class members signed releases or whether they differed from the releases signed by the named plaintiffs. Whether any of the other potential plaintiffs executed general releases, and the effect of those releases on their claims, is a pivotal issue for each of the putative class members. The court is not now in a position to determine how many of the putative class members signed releases, how these releases may have differed among the putative class members, and how each of those releases may affect the viability of the putative class members' claims differently.

The court concludes that the named plaintiffs have not satisfied the typicality requirement because they are subject to unique defenses which threaten to become the focus of the litigation. Further, it is possible that the named plaintiffs are precluded from bringing these claims by virtue of the general releases that they both signed.

Because the court concludes that the named plaintiffs have not satisfied the typicality requirement, the court will not consider the remainder of the defendants' arguments regarding the typicality requirement. Further, it is not necessary for the court to continue its analysis of the remaining class certification requirements, because the plaintiffs' motion necessarily must fail as a result of the lack of typicality.

## CONCLUSION

For the reasons stated herein, the plaintiffs' motion for class certification (document no. 27) is DENIED.

---

6. "[A] general release is valid as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1116 (7th Cir.1990).

7. "A general release of 'any and all' claims applies to all possible causes of action, unless a statute specifically and expressly requires a release to mention the statute for the release to bar a cause of action under the statute. ERISA contains no such requirements. The releases therefore cover plaintiffs' claims for ERISA benefits." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 373 (5th Cir.2002); *Smart v. Gillette Co. Long–Term Disability Plan*, 887 F.Supp. 383, 386 (D.Mass.1995), *aff'd*, 70 F.3d 173, (1st Cir.1995) (employee knowingly, intentionally, and voluntarily agreed to a severance plan that included a general release which precluded her ERISA claim).