# United States Court of Appeals

## For the First Circuit

No. 12-9005

IN RE: THE PLAZA RESORT AT PALMAS, INC.,

Debtor.

———————————————

SCOTIABANK DE PUERTO RICO,

Plaintiff, Appellant,

v.

JOSEPH BURGOS; GILDA CRUZ; LETICIA FLORES BERGANZO;
NOREEN ORTIZ; ELISELINA ROSARIO; DAVID NIETO CARRERO;
LISSETTE VARGAS VALLE; RAFAEL ALMODÓVAR;
FRANCISCO SIERRA MÉNDEZ; MARÍA RODRÍGUEZ DE SIERRA;
CRUZ A. TORRES COLÓN; PAULITA COLÓN FLORES; ERNESTO BRITO;
MARIGLORIA DEL VALLE; CLAUDIO MEDINA; MARÍA ROMERO,

Defendants, Appellees.

———————————————

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

———————————————

Before

Torruella, Selya and Lipez,
<u>Circuit Judges</u>.

———————————————

<u>Víctor J. Quiñones</u>, with whom <u>Morell Bauzá Cartagena & Dapena</u>,
was on brief for appellant.
<u>Gerardo Pavía-Cabanillas</u>, with whom <u>Pavía & Lázaro, PSC</u>, was
on brief for appellees Ernesto Brito and Marigloria Del Valle.

———————————————

January 16, 2014

———————————————

**TORRUELLA, Circuit Judge.** The issue to be decided in this appeal is whether Defendants/Appellees Ernesto Brito and Marigloria Del Valle have a real property interest in an apartment that is part of a timeshare real estate venture undergoing Chapter 11 bankruptcy proceedings. At summary judgment, based on the Puerto Rico Timeshare and Vacation Club Act (the "Timeshare Act" or the "Act"), P.R. Laws Ann. tit. 31, § 1251, et seq., and the sale contract between Brito, Del Valle, and the developer of the timeshare venture (the "Developer"), the bankruptcy court answered that question in the affirmative.[1] The Bankruptcy Appellate Panel ("BAP") affirmed. In disagreement, Plaintiff/Appellant Scotiabank de Puerto Rico asks us to reverse the bankruptcy court's holding on the ground that the requirements for creating real property rights under the Timeshare Act were allegedly never satisfied. After carefully reviewing the record and the applicable law, we affirm.

## I. Background

The chronology of events leading up to this appeal has been properly delineated by the courts below. See In re Plaza Resort at Palmas, Inc., 469 B.R. 398 (B.A.P. 1st Cir. 2012); In re Plaza Resort at Palmas, Inc., Ch. 11 Case No. 09-09980(SEK), Adv. No. 10-00175 (Bankr. D.P.R. May 4, 2011). We therefore by-pass all

---

[1] In a subsequent opinion and order, the bankruptcy court extended its holding to all other timeshare owners similarly situated. Our holding equally applies to those timeshare owners, although we omit further reference to them for the sake of simplicity.

incidental details and focus our factual narrative on the dispositive issues of this appeal, referencing only those facts that are properly documented in the summary judgment record.

The timeshare regime at the center of this litigation was constituted on June 1, 2001, through a public deed entitled "Dedication of Timeshare Regime (The Plaza Resort at Palmas, A Time Share Regime)" (the "Deed"). According to the Deed, the timeshare property is located in Humacao, Puerto Rico, and encompasses 25 apartments "for independent use and occupancy" as vacation residences. The Deed also delineates the terms and conditions governing the timeshare regime as well as the rights and obligations of both the Developer and prospective timeshare owners. The Deed was duly recorded in the Puerto Rico Registry of Property.

Also on June 1, 2001, the Developer granted the Bank and Trust of Puerto Rico a first mortgage (the "Mortgage") over the timeshare property to secure payment on a loan obtained to develop the timeshare regime. R-G Premier Bank of Puerto Rico succeeded the Bank and Trust of Puerto Rico as the mortgagee. But the FDIC took over R-G, and Scotiabank became the successor-in-interest and the holder of the Mortgage. The Mortgage contains the following subordination clause: "The Mortgagee, without payment, hereby agrees to subordinate the lien created hereby in favor of the personal ownership interest of each owner of an accommodation[] or timeshare . . . so long as such owner remains in good standing with

respect to his/her obligations under the timeshare plan documents . . . ." Like the Deed, the Mortgage was duly recorded in the Registry of Property.

The Developer formally commenced marketing the timeshare regime around July 2001. Its marketing efforts included the issuance of a Public Offering Statement explaining to prospective owners the terms and conditions governing the timeshare regime. The Offering Statement made plain that "two mortgages encumber[ed] the real property underlying [the timeshare regime]" and that both mortgages were subordinated "to the rights of the . . . owner of any Unit [therein]."[2]

Approximately a year later, on June 1, 2002, the Developer, Brito, and Del Valle entered into a purchase agreement (the "Sale Contract") pursuant to which the Developer transferred to Brito and Del Valle "a period of ownership . . . of seven (7) days" in Unit No. F1 of the timeshare regime in exchange for $18,200. The "period of ownership" -- which was transferred in perpetuity, free and clear of all encumbrances except taxes and assessments -- afforded Brito and Del Valle the exclusive right to use and occupy Unit No. F1 during one week within a revolving yearly schedule. The Sale Contract also established that Brito and Del Valle's "period of ownership" required them to be "responsible

---

[2] The holder of the second mortgage was the entity that sold to the Developer the real property dedicated to the timeshare regime.

for [their] share of any and all costs and expenses incurred in the operation of the . . . timeshare regime" and to "assume all risks and liabilities resulting from the use of the property and facilities [of the timeshare complex]."

Brito and Del Valle appear to have enjoyed their "period of ownership" over Unit No. F1 without significant impediments during the first seven years of the Sale Contract. On November 20, 2009, however, the Developer filed for Chapter 11 bankruptcy protection, and the litigation underlying this appeal eventually ensued.

In its bankruptcy schedules, the Developer listed Brito and Del Valle as secured creditors. Brito and Del Valle then filed a proof of claim asserting a security interest over real property worth $18,200 and attached the Sale Contract as an exhibit. In affirming the bankruptcy court's holding, we need not, and do not, address Brito and Del Valle's claim that they had a security interest over the timeshare property. Scotiabank answered by filing an adversary proceeding against Brito and Del Valle.[3] Its complaint sought a declaratory judgment that Brito and Del Valle did not possess a valid lien over the timeshare property. For their part, Brito and Del Valle opposed the complaint, and argued, as an affirmative defense, that Scotiabank's secured interest was

_____

[3]   The adversary complaint also named several other timeshare owners as defendants. Brito and Del Valle, however, were the only ones who appeared.

subordinated to their ownership interest pursuant to the subordination clause of the Mortgage.

After preliminary procedural nuances, Scotiabank moved for summary judgment, reasserting its contention that Brito and Del Valle did not have a security interest over the timeshare property. Scotiabank also advanced the argument presented to us on appeal; namely, that Brito and Del Valle did not have a real property interest because the applicable formalities of the Timeshare Act had not been satisfied. Specifically, Scotiabank argued that "when timeshare rights are created as real property rights [under the Timeshare Act], the transfer or sale of said rights may only take place through the execution and recordation of a public deed."[4] Because neither of those formalities had been followed, Scotiabank reasoned, the Sale Contract only afforded Brito and Del Valle the right to use and occupy Unit No. F1 during the so-called period of ownership.

Brito and Del Valle opposed and crossed-moved for summary judgment, arguing that the Sale Contract made plain that they were

_____

[4] Scotiabank also underscored other formalities allegedly required in connection with the recordation process. Moreover, although it recognized being bound by the subordination clause, Scotiabank alleged that this clause merely protected the contract rights (rather than the real property rights) granted to Brito and Del Valle. Scotiabank made these same arguments to the BAP and repeats them before this court. Nevertheless, in light of our holding, there is no need for us to pass upon them.

acquiring a real property interest over Unit No. F1.  They further averred that (1) the Deed and the Mortgage expressly provided that Scotiabank was subordinated to their ownership interest and (2) both documents had been duly recorded, so that the protections of the Timeshare Act had come into play.  Lastly, Brito and Del Valle claimed that they had acquired a statutory lien over the timeshare property as soon as the protections of the Timeshare Act kicked in.  The bankruptcy court granted Brito and Del Valle's cross-motion.  In so doing, it first held that the subordination clause of the Mortgage unequivocally established the mortgagee's agreement to subordinate its lien in favor of the ownership interest of the timeshare owners, "irrespective of whether the accommodation or time share is of the type coupled with special property rights or not."  In re Plaza Resort at Palmas, Inc., Ch. 11 Case No. 09-09980(SEK), Adv. No. 10-00175, slip op. at 9.  For that reason, the court noted, "the issue is not whether the purchasers obtained a security interest by virtue of their agreements with [the Developer] or by operation of law.  Their interest is protected by . . . virtue of the subordination agreement itself."  Id.

        The court next examined the terms of the Deed, the Offering Statement, and the Sale Contract to establish the extent of the parties' bargain.  Id. at 10.  In determining that they had agreed to transfer and obtain a real property interest in Unit No. F1, the court stated:

> [I]t is clear from the documents, taken as a whole, that [the Developer] intended to transfer interests in real property to the purchasers and that the purchasers intended to acquire an interest in real property. The purchase contracts clearly evince a sale of the timeshare interests, with title to unit weeks being free and clear of all encumbrances except taxes and assessments. Title was also transferred in perpetuity, unlike a right to use interest that grants a contractual right to use a vacation facility for a specified number of years.

Id. The court acknowledged the fact that the Sale Contract had neither been formalized into a public deed[5] nor presented for recordation at the Puerto Rico Registry of Property. Id. The court, however, impliedly discarded Scotiabank's argument that the Timeshare Act required such formalities for the creation of real property rights, underscoring two general principles of Puerto Rico law: (1) that "property rights are acquired and transmitted[, inter alia,] . . . in consequence of certain contracts"; and (2) that the Puerto Rico "[R]egistry [of Property] does not give or take away rights." Id. (citing, respectively, P.R. Laws Ann. tit. 31, § 1931;

---

[5] A public deed in the Civil Law tradition, is a public document that describes a legal transaction, composed by a "notary [who] shall write regarding the contract or act submitted for his authorization signed by the grantors . . . signed, marked, and flourished by the notary himself." P.R. Laws. Ann. tit. 4, § 2031. The notary has the power to attest as to the authenticity of the contents of all public documents he or she authors. P.R. Laws Ann. tit. 4, § 2002. Though a public document is required for the creation of certain legal instruments, such as trusts, P.R. Laws Ann. tit. 31, § 2543, and mortgages, P.R. Laws Ann. tit. 30, § 2607, it is not required for the conveyance of real property interests.

and <u>P.R. Prod. Credit Assoc.</u> v. <u>Registrador</u>, 23 P.R. Offic. Trans. 213 (1989)).

Scotiabank appealed to the BAP, which affirmed the bankruptcy court on all fronts. This appeal immediately followed.

## II. <u>Discussion</u>

Federal Rule of Civil Procedure 56, applicable in bankruptcy through Bankruptcy Rule 7056, was the procedural vessel that gave rise to this appeal. Our inquiry therefore seeks to answer whether the moving party is entitled to judgment as a matter of law. <u>Estate of Hevia</u> v. <u>Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010). At this juncture, we review the record <u>de novo</u>, in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. <u>Id</u>. Being plenary, our review need not follow the rationale espoused by the lower court, and we may affirm "the grant of summary judgment on any basis that is manifest in the record." <u>Johan G. Danielson, Inc.</u> v. <u>Winchester-Conant Props. Inc.</u>, 322 F.3d 26, 37 (1st Cir. 2003).

As stated above, Scotiabank's challenge to the bankruptcy court's holding centers on the formalities that the Timeshare Act allegedly requires for the creation of individual real property rights. Our inquiry therefore seeks to determine whether those formalities are indeed encompassed within the Act. Generally, "we look to the pronouncements of a state's highest court in order to discern the contours of that state's law." <u>González-Figueroa</u> v.

<u>J.C. Penney P.R., Inc.</u>, 568 F.3d 313, 318 (1st Cir. 2009) (citing <u>Andrew Robinson Int'l, Inc.</u> v. <u>Hartford Fire Ins. Co.</u>, 547 F.3d 48, 51 (1st Cir. 2008)). Where, as here, on-point authority from the highest state court is unavailable, however, "our task is to vaticinate how that court likely would decide the issue." <u>Id</u>. For this endeavor we employ "the same method and approach that the state's highest court would use." <u>IMS Health</u> v. <u>Ayotte</u>, 550 F.3d 42, 61 (1st Cir. 2008).

Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous. In this respect, the Puerto Rico Civil Code tells us that "when a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof." P.R. Laws Ann. tit. 31, § 14; <u>see also</u>, <u>e.g.</u>, <u>Warner Lambert Co.</u> v. <u>Tribunal Superior</u>, 1 P.R. Offic. Trans. 527, 559 (1973) ("No ambiguity in the letter of the law nor doubts about the legislative intention exist. To enlarge by judicial construction the definition of just cause, as suggested by the intervener, would be tantamount to subverting the true sense and purpose of the statute."). Here, we find no ambiguity in the provisions of the Timeshare Act that Scotiabank relies upon, and, in keeping with Puerto Rico's hermeneutic rules, we look no further than the text of those provisions. Before delving into the merits

of Scotiabank's contentions, however, brief contextual remarks about the Act are in order.

Enacted in 1995, the Timeshare Act is a comprehensive piece of legislation which constitutes "the sole and exclusive law of Puerto Rico governing the creation and disposition of accommodations, timeshares and vacation club rights." P.R. Laws Ann. tit. 31, § 1269. The statement of purpose and scope of the Timeshare Act unequivocally establish its place of prominence within Puerto Rico's economic legislation: "th[e] [timesharing] segment of the tourism industry continues to grow, both in volume of sales and in complexity and variety of product structure; [accordingly] . . . a uniform and consistent method of regulation is necessary in order to safeguard Puerto Rico's tourism industry, Puerto Rico's consumers and Puerto Rico's economic well-being." Id. § 1251.

To effectuate its purpose, the Timeshare Act sets forth a number of formalities that a timeshare developer must follow when establishing a timeshare regime. The process starts with a timesharing permit application filed with the Puerto Rico Tourism Company (the "Company"), providing specific information about the developer, the timeshare property, and the timeshare plan. Id. §§ 1252a - 1252e. If the Company grants the timeshare permit, the developer must establish the so-called timeshare regime through the issuance and recordation of a public deed. Id. § 1252a. "The deed

-11-

. . . shall . . . clearly and precisely state the use to which all the area included in the real property and dedicated to the regime shall be devoted . . . ." Id. § 1262.[6] Moreover, "[o]nce dedicated, the timeshare . . . regime may only be modified or terminated with the express conformity of the Company . . . ." Id.

The Act affords several safeguards to prospective and actual timeshare owners. For example, the developer is required to provide prospective owners with an offering statement delineating the terms and conditions that would govern a possible purchase as well as the rights and obligations that would arise once a purchase is closed. Id. §§ 1255-1255d. Furthermore, upon closing, a timeshare owner is automatically protected against certain liens and encumbrances inasmuch as the Act requires all lienholders with an interest in the timeshare property to "execute[] and record[] among the appropriate public records . . . a subordination agreement" recognizing the superior rights of timeshare owners. Id. § 1254. Such protection is "effective against the subordinating lienholder's successors and assigns and any other person who

---

[6]    The public deed must also include specific and general information about the timeshare regime, including, among other things, (1) a description of each accommodation as well as a description of the facilities of the property; (2) the term of the timeshare regime; (3) the area of all the accommodations in the property and area of each accommodation; (4) the share of each accommodation in the corresponding common facilities; and (5) a description of the entity that will manage the regime as well as the duties, responsibilities, and obligations of the same. P.R. Laws Ann. tit. 31, § 1264.

acquires the accommodation . . . through foreclosure, by deed in lieu of foreclosure or by any other legal means . . . ." Id. § 1262a-1.

Scotiabank does not dispute that a timeshare regime and a binding subordination agreement are in place. Scotiabank instead urges us to focus our sight on the type of rights available to Brito and Del Valle under the timeshare regime. Section 1252a of the Act provides a developer of a timeshare regime with the option to confer to timeshare owners either (1) "a contractual right to use and occupy an accommodation," or (2) "a special type of property right with respect to a particular accommodation . . . ." Id. § 1251a. According to Scotiabank, certain formalities must be followed when the developer's intention is to confer special real property rights. In particular, Scotiabank points to §§ 1262a and 1264a,[7] which it cites to support its live-or-die proposition that "when a timeshare regime is created to confer real property rights, the transfer or sale of said rights may only take place through the execution and recordation of a public deed." That proposition, however, finds no support in the plain text of §§ 1262a and 1264a.

In pertinent part, § 1262a establishes that "[o]nce the property is dedicated to the timeshare . . . regime . . . the accommodations, may be . . . the object of . . . all types of

---

[7] Sections 1262a and 1264a only apply if the timeshare developer has structured the timeshare regime to confer special real property rights. P.R. Laws Ann. tit. 31, § 1262.

juridic[al] acts . . . and the corresponding titles <u>may be recorded</u> in the Registry of Property . . . ." (emphasis supplied).  Section 1264a, in turn, establishes that

> [t]he deed of transfer of each individual accommodation shall state [particular information about] the accommodation concerned and, also, the share pertaining to said accommodation in the facilities. Furthermore, said deed of transfer shall contain a warning . . . stating that the accommodation being transferred pursuant to such deed is not subject to the . . . Horizontal Property Act of Puerto Rico[8] . . . [or] the protective measures afforded [therein] . . . .

To discard Scotiabank's contentions, we need go no further than the "may be recorded" phrase in § 1262a.  That phrase unambiguously indicates that recordation of special real property rights is an option, not an obligation.  <u>See</u>, <u>e.g.</u>, <u>Blatt & Udell</u> v. <u>Core Cell</u>, 10 P.R. Offic. Trans. 179 (1980) (noting that the verb "may" generally denotes discretion rather than a mandate); <u>see also</u> <u>López</u> v. <u>Davis</u>, 531 U.S. 230, 240 (1997) (noting that the legislative use of the word "may" generally indicates a grant of discretion); <u>Raselli</u> v. <u>Warden, Metro. Corr. Ctr.</u>, 782 F.2d 17, 23 (2d Cir. 1986) ("The use of a permissive verb -- 'may review' instead of 'shall review' -- suggests a discretionary rather than

---

[8]  The Horizontal Property Act, now known as the Condominium  Act, P.R. Laws Ann. tit. 31, § 1291, <u>et seq</u>., provides a regime, and organization requirements pertaining typically to condominiums and multi unit residential developments.

-14-

mandatory review process.")[9].  Furthermore, the Act uses the same "may be recorded" phrase when referencing the individual timeshare rights that can access the Registry -- "[The timeshare[] . . . rights which may be recorded . . . ."  P.R. Laws Ann. tit. 31, § 1265a (emphasis supplied).  There can hardly be a clearer indication that recordation is not required for the creation of individual real property rights.  See Pueblo de P.R. v. Hernández-Maldonado, 1991 P.R.-Eng. 735, 865, P.R. Offic. Trans. (1991) ("Statutes should be treated as a harmonious whole, and should be read together and not construed as divorced from their provisions.") (internal quotations omitted); see also Ratzlaf v. United States, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").  Although our analysis could very well end here, see P.R. Laws Ann. tit. 31, § 14, there are at least two other reasons why Scotiabank misses the mark.

The first reason is that, rather than acknowledging the permissive nature of § 1262a's language, much less attempting to

---

[9]  The "may be recorded" phrase became part of § 1262a in 1999 as one of a number of amendments introduced into the statute that year.  1999 P.R. Laws 003 (amending 1995 P.R. Laws 252).  The new language replaced the phrase "shall be recordable." Unfortunately, the specific reasons behind the change in § 1262a are not ascertainable, as there appears to be no legislative history or interpretative commentary in this regard.  We, however, see no reason to interpret the amendment as anything other than an attempt to clarify that recordation is not a conditio sine qua non under § 1262a by jettisoning from its text the mandatory verb "shall" and replacing it with the permissive, "may."

reconcile the obvious tension between that language and its contentions, Scotiabank disingenuously rests its case entirely on the one-sentence, perfunctory proposition previously quoted. We routinely discard lackluster efforts of that sort. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[T]he settled appellate rule [is] that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The second reason is premised on the oft-quoted maxim of statutory interpretation expressio unius est exclusio alterius, which tells us that when a legislature "includes particular language in one section of a statute but omits it in another . . . it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983)(internal quotation marks and citations omitted). Here, the Timeshare Act, when so required, unequivocally establishes the specific formalities a given document must follow. For instance, § 1251a expressly and unequivocally establishes that the timeshare regime comes into being only after both the issuance of a public deed and recordation. The same expressed mandate is contained in many other sections of the Act. See P.R. Laws Ann. tit. 31, §§ 1254, 1264, 1264a, 1266e. Accordingly, the fact that § 1262a nowhere mentions "publication"

or "recordation" as requisite formalities forecloses Scotiabank's contentions.

Section 1264a does not provide Scotiabank any more support. That section sets forth some of the specifics that a deed of transfer must include, and, in so doing, arguably requires the execution of such a document when formalizing the transfer of individual timeshare rights. Section 1264a, however, nowhere requires that the "deed of transfer" be embodied in any particular form. Neither does it require that it be formalized into a public deed, nor that it be recorded (which, of course, would contradict the "may be recorded" language of §§ 1262a and 1265a). Moreover, the term "deed of transfer" is not defined in the section containing the terms of art of the Act, and Scotiabank has failed to provide us with any applicable authority ascribing a specific meaning to such a phrase. We therefore fail to see why or how Scotiabank reads the terms "public deed" and "recordation" into section § 1264a. The fact that Scotiabank cites § 1264a without articulating a single word to explain why this provision is controlling, does nothing to advance its cause.

The dissent would have us draw another theory from Scotiabank's appeal, though admittedly not without a generous reading. Throughout its brief, Scotiabank mentions repeatedly that the Deed created only personal contractual rights. One might construe this blanket assertion as a hint of a challenge to the

bankruptcy court's conclusion that the rights conveyed to Brito and Del Valle by way of the Deed are real property rights. The dissent recites Scotiabank's empty proclamation, as proof that such an argument has been preserved. As the catalogue provided by our brother in the appendix shows however, Scotiabank's litany amounts to little more than a conclusory assertion with essentially no explanation or support provided. A mere passing reference on the part of Scotiabank, however many times repeated, does not amount to an argument that commands our attention. <u>Zannino</u>, 895 F.2d at 17. The dissent even cites to specific sections of the Deed as well as the Public Offering Statement, in an attempt to construct the contract rights argument, an endeavor entirely foregone by Scotiabank. Accordingly, we decline to afford a sophisticated plaintiff an argument it has not made or elaborated, and that the opposing litigant has had no opportunity to address. <u>Landrau-Romero</u> v. <u>Banco Popular de P.R.</u>, 212 F.3d 607, 616 (1st Cir. 2000) ("It is well settled that arguments not raised in an appellant's initial brief are waived." (citations omitted)).

In any event the argument, if there is one, fails. Perusal of the Deed reveals it is far from enlightening, and at best ambiguous as to the nature of the rights in question. Though Section V of the Deed states that an "Accommodation Unit" is submitted to the timeshare regime via a contract that grants the buyer the right to use and occupy the unit, Section II defines

"Accommodation Unit" as a "Unit."  "Unit" is in turn defined as "that part of the Timeshare Property which is subject to ownership by one or more persons."  (emphasis supplied).  The Deed defines "Timeshare Property" as "The Parcel together with the concrete buildings and other improvements constructed thereon, any easements and other rights appurtenant to such buildings and improvements and any personal property located thereon intended for the use specified in the next paragraph hereof, now existing or hereafter acquired." (emphasis supplied).  The Deed incontrovertibly defines "Parcel" as real property: "certain parcel of land located in Humacao, Puerto Rico" that "is recorded in the Registry at page 197 of volume 382 of Humacao, property number 16,851."  Because "Timeshare Property" is defined as specific real property, a "Unit" and, therefore, an "Accommodation Unit," seem to mean real property that has been submitted to the timeshare regime for ownership.  Further, the definition of the term "Unit" also establishes the rights that are conveyed by way of the contract to use and occupy, referred to in Section V; the contract to use and occupy conveys a "Unit Week" on an "Unit."  Yet another defined term, "Unit Week" is equivalent to a "period of ownership in an Unit." (emphasis supplied).  Further examination of the Deed only complicates the inquiry.  Therefore, Scotiabank's unsubstantiated assertions as to the Deed's lucidity are clearly wrong.

Our brother rejects our take on the Deed as, at most, ambiguous, and points to other language that, according to the dissent, makes clear that the Deed grants contract rights. Respectfully, this view seems to ignore the language of the Deed that we quote above regarding the definition of a "Unit" and "Timeshare Property," and the, at best, ambiguous nature of the Deed. The dissent also dismisses, though the bankruptcy court did not, that the Deed provides for the "Units" to be transferred "free and clear of all encumbrances" and in perpetuity. These are rarely the features of a contract right, but rather are traits usually reserved for transfers of title to real property. That the lower court's take on the matter is contrary to that of the dissent is alone quite telling of the Deed's, at best, ambiguous nature.

In any event, we need not continue down the path of hermeneutics. Scotiabank, marshals no substantial challenge here on appeal to the bankruptcy court's reasoning and findings. We thus leave undisturbed the bankruptcy court's analysis, and its conclusion, that the timeshare holders wield real property rights. Landrau-Romero, 212 F.3d at 616.

Notwithstanding Scotiabank's failure to challenge, on appeal the bankruptcy court's findings regarding the parties' intent and the timeshare documents, the dissent would embark us on a flight of fancy to consider extrinsic evidence as to the parties' state of mind. Our brother apparently fails to note that

Scotiabank not only failed to make such an argument, but also explicitly stated in its brief before us that resorting to the parties' intent is inapposite.[10] Nevertheless, the dissent insists that we look to the Public Offering Statement and Sale Contract to address an issue specifically renounced by Scotiabank. We briefly brush this orphaned contention, arguendo.

As to the Public Offering Statement, our dissenting colleague "focuses with laser-like intensity" indeed, on the phrase "contractual ownership interests" for the proposition that the timeshare regime was meant to be contractual. However, the Public Offering Statement also provides that "[t]he Timeshare Interests will be sold to Purchasers pursuant to a Purchase Contract between the Purchaser and the Developer." Accordingly, "Contractual ownership interests" could reasonably mean those real property ownership interests specified in, and sold by way of, the Sale Contract.

As to the Sale Contract, the dissent, but not Scotiabank, purportedly identifies two leads in favor of the contract rights theory. First, that the agreement requires the buyer to pay for the filing fees necessary to perfect a security interest over a purchased timeshare unit, in favor of a specific lender identified as Banco Financiero de Puerto Rico. This lender apparently offered to provide financing to buyers, and required a security interest

_____

[10]  Appellant's Br. at 19.

over the sold units as collateral in consideration for credit. The dissent's theory follows, that since under Puerto Rico law security interests over real property are perfected via recordation in the Registry of Property, and not through UCC filings, this points to the parties' belief that they bargained for contract rights only.

Particularly damning to this proposition is that the record is devoid of any indication that any party here even attempted to perfect a security interest. Furthermore, and to say nothing of the inferential leap required of this imaginary peek into the mind of a buyer, this theory rests on the assumption that the appellees here sought financing as provided in the Sale Contract. And though the Sale Contract between the parties hints that the brunt of the purchase price would be financed, the agreement also requires that loan documents to that effect be submitted with the Sale Contract. Yet there are no loan documents before us, nor anything else in the record, that allow such an assumption. Moreover, our colleague's theory rests on yet another assumption; that the UCC filing regime's exceptions apply under the Timeshare Act. The problem with this assumption is that the Timeshare Act nowhere states as much, and Puerto Rico courts have thus far remained silent on the matter. Normally, when presented with unanswered inquiries of state law we endeavor to resolve matters as best we can surmise the state court would. Hatch v. Trail King Indus., Inc., 699 F.3d 38, 46 (1st Cir. 2012). The

question here is particularly nuanced, given that the Timeshare Act expressly creates a "special type of property right." P.R. Laws Ann. tit. 31, § 1251a. However, we again decline to attempt to answer it on a barren record, where neither party has briefed the issue, nor have the courts below addressed it. See Landrau-Romero, 212 F.3d at 616. More is needed indeed.

Second, the dissent points to the Sale Contract's purported failure to describe the timeshare units in the detailed manner required by § 1264a and § 1264(1)(b) of the Timeshare Act for real estate conveyances. However, the Sale Contract expressly states, "[t]he terms used in this Contract shall have the same meaning as the identical terms utilized in the Deed (defined below) for this timeshare Plan (define[d] below) unless such terms are otherwise define[d] herein." Each Sale Contract specifies a Unit No., and the Deed describes the Unit corresponding to each Unit No. in every bit of detail required by the Timeshare Act. Therefore, the Sale Contract complies with the Timeshare Act by expressly incorporating these meanings from the Deed.[11]

---

[11] The dissent also contends that the appellees' failure to record their real property interest in the Property Registry, is yet another omen that the parties intended to transfer contractual and not real property rights. On that point, elsewhere in our opinion we have already discussed that the permissive language of §§ 1262a and 1265a of the Timeshare Act makes clear that recordation of timeshare property interests is not mandatory. The dissent itself agrees that it "is both true and uncontroversial" that "recordation of purchase agreements at the Registry of Property is not an absolute requirement for the creation of a real property timeshare regime." Furthermore, and as the bankruptcy court duly noted, it

-23-

In any event, we reiterate our steadfast opposition to addressing documents not alluded to by Scotiabank, in light of arguments not forwarded by it either. Landrau-Romero, 212 F.3d at 616. The bankruptcy court's finding that the timeshare regime transferred real property rights, as well as the factual findings regarding the parties' intent, went unchallenged and are foreclosed from our review.

As our dissenting colleague cogently points out, the appellants' purported arguments were "awkwardly developed in some respects and did not always highlight the most telling aspects of the relevant documents," which "evinces sloppy lawyering." Nevertheless, according to his view, we are required to undertake "some independent inquiry," because the appellants "did enough, if barely, to preserve [the real property issue] for review." This, of course, is a degree of benevolence not normally offered by a court to a party in our adversarial system, particularly when dealing with one that hardly classifies as an indigent pro se litigant, or is lacking competent legal representation. Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 70 (1st Cir. 2005). Accordingly, though we should not have to address our

is an axiomatic principle of Puerto Rico law that the Property Registry "does not give or take away rights." P.R. Prod. Credit Assoc. v. Registrador, 123 P.R. 231, 237-38 (1941), 23 P.R. Offic. Trans. 213 (1989). Therefore, the appellees' failure to record their real property interest, though perhaps unwise on their part, is far from the smoking gun the dissent purports it to be.

brother's remaining thoughts on this matter, we are particularly concerned with the issues raised by the dissent regarding the specific treatment given to timeshare buyers by the Bankruptcy Code pursuant to 11 U.S.C. §§ 101 (53D), 365(h)-(j). It is most telling that the dissent concludes that "there are no findings" by the prior courts that dealt with these provisions. The likely reason for that, is that there is no mention of § 101 (53D) to be found anywhere in the record, and § 365(h)-(j) was not addressed by either party in the bankruptcy court. Courts do not usually make findings on issues not raised before them.

The long and short of it is that the Timeshare Act unambiguously provides that neither publication nor recordation is a conditio sine qua non for the creation of individual real property rights. Accordingly, the bankruptcy court correctly endeavored to determine whether the parties had intended to create real property rights with their bargain. Scotiabank failed to challenge on appeal the bankruptcy court's finding regarding the intention of the parties as to the creation and transfer of real property interests. Thus, the bankruptcy court's conclusions are entitled to remain unaltered. Landrau-Romero, 212 F.3d at 616. Scotiabank failed to challenge the court's interpretation of the documents underlying the parties' agreement, and rather pinned its appeal only on a flawed interpretation of the Timeshare Act. The result of that strategy is now binding on Scotiabank.

### III.  <u>Conclusion</u>

If presented with the record before us, we are confident that the Puerto Rico Supreme Court would arrive at the same conclusions we reach today.  The bankruptcy court's judgment is therefore affirmed.

**<u>Affirmed</u>.**

**"Dissenting opinion follows"**

**SELYA, Circuit Judge (dissenting).** The majority focuses with laser-like intensity on the question of whether the intervals purchased by the timeshare buyers in this case constitute real property as opposed to purely contractual interests. After deciding that those intervals comprise real property, the majority then washes its hands of the matter.

In my view, the majority incorrectly answers the question that it poses. Equally as important, this question — no matter how it is answered — is not dispositive of the broader question of the parties' rights in bankruptcy. For both of these reasons, I respectfully dissent.

The scene is easily set. As the majority concedes, the Timeshare Act allows a developer to choose between creating a timeshare regime in which purchased intervals (Units) are either contractual in nature or comprise "a special type of property right." P.R. Laws Ann. tit. 31, § 1251a.

The majority rests its real property conclusion on two primary foundations. First, it argues that recordation of purchase agreements at the Registry of Property is not an absolute requirement for the creation of a real property timeshare regime. Ante at 14-17. That fact is both true and uncontroversial — but simply because a developer can do something does not mean that this developer followed such a course. The majority pays no heed to this second step, noting ambiguity in the dedication deed and then

-27-

resting on conclusions of the bankruptcy court (conveniently deeming them unchallenged).

But I cannot accept the majority's ipse dixit that the appellant is foreclosed from arguing that the timeshare regime is structured to convey wholly contractual rights. This argument has been a mainstay of the appellant's case throughout the tortuous course of this litigation. As the majority itself concedes, the argument is "mention[ed] repeatedly" in the appellant's brief. Ante at 17. Indeed, the appellant spotlights this issue in the very first sentence of its argument summary, designates it as a controverted issue on appeal, and refers to it many times in the body of its brief.[12]

Nor was the argument waived below. The appellant raised it before both the Bankruptcy Appellate Panel and the bankruptcy court (and both of those tribunals acknowledged as much). See In re Plaza Resort at Palmas, Inc., 469 B.R. 398, 404-05 (B.A.P. 1st Cir. 2012); In re Plaza Resort at Palmas, Inc., Ch. 11 Case No. 09-09980, Adv. No. 10-00175, slip op. at 5 (Bankr. D.P.R. May 4, 2011); see also Appendix A. To the extent that the bankruptcy court found the timeshare interests to be real property, see ante

---

[12] I enumerate some examples in Appendix A. In the same appendix, I likewise list examples of similar arguments pressed by the appellant before the Bankruptcy Appellate Panel and the bankruptcy court.

at 20, the appellant preserved the question by continuing to press the point to the Bankruptcy Appellate Panel and now to us.

In an effort to detour around this well-documented trail, the majority questions whether the appellant has developed its argument with sufficient meticulousness. In framing this question, however, the majority sets the bar too high.[13]

It is true, of course, that an argument "adverted to in a perfunctory manner" is waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). This rule of practice, however, does not require that arguments be precise to the point of pedantry. Where, as here, an issue has been squarely advanced, an appellate court can — and in the interests of justice should — "go beyond the reasons . . . articulated in the parties' briefs to reach a result supported by law." United States v. One Urban Lot Located at 1 St. A-1, 885 F.2d 994, 1001 (1st Cir. 1989) (emphasis in original). The Supreme Court has made this point with conspicuous clarity: "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991). The inquiry, then,

---

[13] This attempt to evade the issue is particularly ironic because the majority relies on an interpretation of the Timeshare Act, see ante at 14-17, that the appellees have never mentioned at any stage of this litigation.

inevitably turns on the level of specificity that a court should require in order to deem an argument preserved.

In this case, the appellant has surpassed the requisite level of specificity. It advanced its contractual rights argument plainly, prominently, and persistently. Even the majority acknowledges that this argument presents the principal issue to be decided on appeal. See ante at 2.

To be sure, the contractual rights argument was awkwardly developed in some respects and did not always highlight the most telling aspects of the relevant documents. But an argument is not waived merely because it is inartfully crafted. See, e.g., United States v. Dunbar, 553 F.3d 48, 63 n.4 (1st Cir. 2009) (treating issue as preserved even though the "brief does not state [the] claim artfully"); Michelson v. Digital Fin. Servs., 167 F.3d 715, 719-20 (1st Cir. 1999) (similar). What counts is that the appellant hinged its argument to the framework of the timeshare regime. That it did not parse each and every document evinces sloppy lawyering, but that failure, without more, does not produce a waiver. The documents are in the record, and an inquiring court must be expected to carry out some independent inquiry.

Viewed against this backdrop, it is obvious to me that the issue is properly before this court. The appellant did enough, if barely, to preserve it for review. We are, therefore, duty-

bound to resolve the issue based on the record and the governing law.

This brings me to the meat of the appeal. The timeshare documents, read in light of the Timeshare Act, demonstrate that the parties purposed to transfer contractual interests, not real property. The Timeshare Act, which provides that the nature of the interests to be conveyed is at the "option of the declarer," puts the dedication deed (the Deed) at the center of this inquiry. P.R. Laws Ann. tit. 31, § 1251a.

Although the Deed will not win any prize for legal writing, it firmly supports the conclusion that the interests conveyed are contractual. I describe some salient features:

- Section V of the Deed is titled "Specific Timeshare Rights in Timeshare. (Contractual Interests in Unit Weeks and Appurtenant Rights)."

- The same section speaks of execution of a "contract of right to use and occupy," through which the developer will grant "the contractual right to use and occupy."

- The Deed definitions call for "Units" to be committed to the regime upon the execution of "contract[s] of right to use and occupy."

Given this straightforward language, I disagree with the majority's characterization of the Deed as "ambiguous." Ante at 18. To the exact contrary, it describes the contractual nature of the regime

-31-

in terms that closely track section 1251a of the Timeshare Act. See P.R. Ann. tit. 31, § 1251a (describing "[a] contractual right to use and occupy").

Even if the Deed were ambiguous on this point, extrinsic evidence would then become relevant to an ensuing inquiry into the parties' intentions. See Smart v. Gillette Co. LTD Plan, 70 F.3d 173, 178 (1st Cir. 1995) (describing appropriate uses of extrinsic evidence to aid interpretation of ambiguous contract). As this case was decided below at summary judgment, our review is de novo. The public offering statement and the purchase-and-sale agreement are key pieces of extrinsic evidence in the summary judgment record — and our inspection of these documents confirms that these timeshare interests are contractual.

Under the Timeshare Act, a public offering statement must be approved by the Puerto Rico Tourism Company and presented to every prospective buyer prior to any purchase of a Unit. P.R. Laws Ann. tit. 31, § 1255. The public offering statement for this development is part of the record, as are the appellees' representations that they received, reviewed, and fully understood it. Consequently, the public offering statement is a prime source of extrinsic evidence here.

This statement leaves no doubt but that the timeshare regime was meant to be contractual. It provides unequivocally that "[u]nder the timeshare regime, contractual ownership interests will

-32-

be sold to the Purchasers." It goes on to say that the owners will be given "the exclusive use and occupancy" of certain Units by means of "contractual ownership interests." To cinch matters, it defines "Timeshare Interest" and "Unit Week" as "the timeshare contractual ownership interest in the Plaza Resort owned by the Owner, which timeshare contractual ownership interest gives the Owner the exclusive use and occupancy of" a certain Unit. Read in its entirety, the public offering statement furnishes incontrovertible evidence of the developer's intent to create and transfer contractual rights.

If more is needed, the timeshare interests here were conveyed by a purchase-and-sale agreement (the Sale Contract) tailored to this timeshare regime. The Sale Contract quite clearly indicates that the parties intended to transfer and receive contractual interests. For example, the developer facilitated bank financing for purchasers, and the Sale Contract requires the purchasers to pay the "fees relating to the UCC filing to perfect the security interest" of the lender in their Units. Whether or not these buyers actually availed themselves of this financing arrangement, this provision is material because, under applicable Puerto Rico law,[14] security interests in real property are perfected

---

[14] Puerto Rico recently revised its version of the UCC. See Puerto Rico Act No. 21 of Jan. 17, 2012. Those revisions, not yet codified, do not apply to the matters at issue here. Accordingly, an explication of them would serve no useful purpose.

through recording in the Registry of Property, see P.R. Laws Ann. tit. 30, § 2577, not through UCC filings, see id. tit. 19, § 2004(j) (excluding real property interests from scope of UCC filing regime). Seen in this light, it is evident that the appellees did not consider the purchase of their Unit to be a real-estate transaction.

The Sale Contract supplies yet another clue that the parties meant to make the transferred ownership contractual in nature. Section 1264a of the Timeshare Act applies only to real property timeshare regimes. See id. tit. 31, § 1262. Although the majority is correct in noting that this provision does not explicitly require the instrument of transfer to "be embodied in any particular form," ante at 17, it does demand that, as a real-estate conveyance, the instrument include "the particulars prescribed in [section] 1264(1)(b)." P.R. Laws Ann. tit. 31, § 1264a. In turn, section 1264(1)(b) requires a description of the Unit, including "its measures, location, rooms," and other specific details. Id. § 1264(1)(b).

Here, the Sale Contract — which did not contain this information — constituted the instrument of transfer. It would seem, therefore, that the Sale Contract was incapable of conveying an interest in real property.

The majority's riposte stems from a pro forma declaration that terms used in the contract shall have the same meaning as

identical terms used in the Deed.  From this single sentence, the majority extravagantly concludes that the Sale Contract complies with section 1264a.  <u>Ante</u> at 23.  I think that this conclusion is overly optimistic and, in all events, it would be highly unusual for parties to draft a real estate conveyance that omitted a meaningful legal description of the property conveyed.  At the very least, such a glaring omission would make any fair-minded observer skeptical of whether the parties intended to transfer real property at all.

This powerful array of documentary evidence is not diminished by the majority's reliance on the use of words like "owner" and "ownership" in the Deed.  <u>See</u>, <u>e.g.</u>, <u>ante</u> at 19.  The Timeshare Act defines the term "owner" in a manner that reaches timeshare buyers under both contractual and real property regimes. <u>See</u> P.R. Laws Ann. tit. 31, § 1251b(25) (defining "owner"). Moreover, the concept of "ownership" applies naturally to both contractual interests and real property interests — and the former reading is a superior fit for the language of the Deed and other transaction documents.  If this were not the case, phrases like "contractual ownership interest" would make no sense.

Much the same is true of the bankruptcy court's emphasis on the phrase "free and clear of all encumbrances" and the fact that the granted rights run in perpetuity.  <u>See In re Plaza Resort at Palmas, Inc.</u>, Ch. 11 Case No. 09-09980 (SEK), Adv. No. 10-00175,

slip op. at 10-11. These transaction terms are neutral; there is no earthly reason why their use would be inappropriate under a contractual rights regime.

Based on the totality of the documentary evidence, it seems virtually unarguable not only that the developer intended to create and transfer contractual timeshare interests but also that the appellees accepted their Unit on such an understanding. It follows that the majority's heavy reliance on the permissive "may be recorded" language of section 1262a, see ante at 14-17, is misplaced. After all, the Timeshare Act specifically excludes contractual timeshare regimes from the grasp of section 1262a. See P.R. Laws Ann. tit. 31, § 1262.

Indeed, if the parties' failure to record is relevant at all, it cuts the other way. Had the appellees believed that they were purchasing real property interests, they almost certainly would have recorded those interests. It is common ground that an owner's failure to record an interest in real property exposes the owner to significant risk. Should a subsequent good-faith purchaser of the same property record first, he will become the rightful owner even though his deed is later in time. See P.R. Laws Ann. tit. 31, § 3822; see also United States v. One Urban Lot Located at 1 St. A-1, 865 F.2d 427, 429 (1st Cir. 1989) (discussing the "safeguards of [Puerto Rico's] strict Registry system"); United States v. V & E Eng'g & Constr. Co., 819 F.2d 331, 333 (1st Cir.

1987) (describing Puerto Rico's registry system as promoting "reliance on public records of property ownership"). Because recordation provides such important protections for real property buyers, it would be highly unusual for anyone, let alone parties who had lawyers and financing banks looking over their shoulders, to structure a real-estate conveyance without providing for recordation.[15]

To sum up, I disagree with the majority's conclusion that the rights possessed by the appellees are real property rights. I also disagree with the majority's assumption that answering this question ends the inquiry. Let me explain.

This case was commenced as an adversary proceeding that sought a declaration as to whether the appellees should be regarded as secured creditors. But regardless of whether the appellees possess contractual or real property interests, their claim to secured creditor status requires a further determination because the Bankruptcy Code includes specific safeguards for timeshare buyers. See 11 U.S.C. §§ 101(53D), 365(h)-(j); see also 3 Collier on Bankruptcy ¶¶ 365.11(4), 365.12(3) (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).

The Bankruptcy Code has long furnished special protections to lessees or buyers of real property when the lessor

---

[15] In this regard, it is noteworthy that the transaction here was not geared to recordation. For aught that appears, the signatures on the pertinent documents were not even notarized.

or seller enters bankruptcy and seeks to reject the lease or purchase agreement as an executory contract. See 11 U.S.C. § 365(h)-(j). In 1984, Congress extended these protections to owners of timeshare interests. See Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, §§ 401-404, 98 Stat. 333, 366-67 (1984). This extension was intended to overrule cases like In re Sombrero Reef Club, Inc., 18 B.R. 612 (Bankr. S.D. Fla. 1982), which had allowed timeshare agreements to be rejected out of hand as executory contracts. See In re Lee Road Partners, Ltd., 155 B.R. 55, 61 (Bankr. E.D.N.Y. 1993); 3 Collier on Bankruptcy, supra, ¶ 365.11(4).

Under this prophylaxis, when a bankrupt debtor seeks to reject a timeshare agreement as an executory contract, the timeshare owner has two options. If the timeshare owner is in possession or the term of the timeshare interest has commenced, he may remain in possession of his timeshare interest. 11 U.S.C. § 365(h)(2)(A)(ii), (i)(1). If he does so, he can set off any damages caused by the debtor's post-rejection nonperformance against any payments due to the debtor, including deferred purchase price installments and annual maintenance fees. Id. § 365(h)(2)(B), (i)(2)(A).

As an alternative, the timeshare owner can treat the timeshare interest as terminated and file a claim for damages against the bankruptcy estate. Id. § 365(h)(2)(A)(i), (i)(1).

-38-

Under section 365(i), his damages claim would seem to be secured (at least up to the amount of the purchase price paid). <u>See</u> <u>id.</u> § 365(j). Under section 365(h), however, the claim would seem to be unsecured. <u>See</u> 3 <u>Collier on Bankruptcy</u>, <u>supra</u>, ¶ 365.11(4) (discussing availability of lien under subsection (i) but not under subsection (h)).

The facts here are inscrutable: the record before us does not indicate whether the appellees' timeshare contract was ever formally rejected. By like token, it does not indicate whether the appellees were ever afforded an opportunity to make their election under section 365.

An authoritative determination as to whether the appellees are secured creditors cannot be made in a vacuum. On the one hand, unless and until the appellees' timeshare interest is rejected, it may represent a valid and enforceable contract despite the bankruptcy. On the other hand, if the debtor has formally rejected the agreement — a course of action that seems consistent with the reorganization plan — section 365 would come into play and the appellees would have to be allowed to make elections as provided therein.

The situation is further complicated because the relationship between sections 365(h) and 365(i) is especially tenebrous in the timeshare context. <u>See</u> <u>id.</u> To the extent that these subsections may be relevant, it seems likely that factual

findings will be helpful in determining not only which subsection will apply but also whether the appellees should be considered "in possession."  See generally 3 Collier on Bankruptcy, supra, ¶ 365.12(3) (discussing unique difficulty of "in possession" concept in timeshare context).

Here, there are no findings.  With only a single (meaningless) exception, neither the parties nor the courts below have so much as acknowledged the existence of the relevant statutory provisions.

Given the utter absence of such findings, the appellees' claim to secured creditor status is left up in the air.  I would, therefore, reverse the decision holding the appellees' timeshare interest to be a real property interest and remand to the Bankruptcy Appellate Panel with instructions that it remand to the bankruptcy court for further proceedings.

## APPENDIX A

### Appellant's Court of Appeals Brief

The appellant's brief to this court contains its contractual rights argument in at least the following places:

- The appellant's argument summary begins: "[p]ursuant to the Timeshare Act, the Regime subject of this appeal was constituted to grant contractual (personal) rights to the timeshare owners since [the Deed], which dedicated the Regime, explicitly declares so."

- The appellant's second issue is framed as "[w]hether the owners . . . may be granted secured creditor status . . . despite the fact that the Regime was constituted by [the Deed] to grant contractual (personal) rights to the timeshare owners and no real property interest was conveyed."

- The first bolded header in the brief's argument section reads: "[t]he Timeshare Regime was structured to confer contractual (personal) rights to the timeshare owners."

- Later in the brief the appellant argues that "[the Deed] constituted the Timeshare Regime to grant contractual (personal) rights to the timeshare owners and no real property interest was conveyed pursuant to the Timeshare Act."

- The appellant also declares that "[the Deed], which constituted the Regime in the present case, explicitly states, using the statutory language, that the timeshare rights in the Regime are of a contractual (personal) nature."

### Appellant's Brief to the Bankruptcy Appellate Panel

The appellant's brief to the Bankruptcy Appellate Panel contained its contractual rights argument in at least the following places:

-41-

- The brief presents the second issue as "[w]hether the owners of timeshare rights in the Regime may be granted secured creditor status . . . despite the fact that the Regime was constituted by [the Deed] to grant personal (contractual) rights to the timeshare owners and no real property interest was conveyed."

- The second sentence of the brief's statement of the case reads: "[the Deed] specifically states that the timeshare rights in the Regime are of a personal (contractual) nature."

- In its synopsis of the facts, it declares that "[the Deed] specifically states that the timeshare rights in the Regime are of a personal (contractual) nature."

- The first bolded header of its discussion section reads: "[t]he Timeshare Regime was structured to confer personal (contractual) rights to the timeshare owners."

## Proceedings Before the Bankruptcy Court

In proceedings before the bankruptcy court, the appellant pressed its contractual rights argument in at least the following places:

- The appellant's initial adversarial complaint argues that "[the Deed] specifically states that timeshare rights in the Regime are of a personal (contractual) nature."

- The first paragraph of the appellant's memorandum of law in support of its motion for summary judgment argues that "the owners of timeshare rights in this particular regime have no property rights, but merely a contractual (personal) right."

- The first sentence of the section of the appellant's memorandum of law in support of its motion for summary judgment that applies the law to the facts reads: "[i]n this case, the Timeshare Regime was constituted to grant personal (contractual) rights to timeshare owners."